No. 20-17316

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

BENJAMIN KOHN,
*Plaintiff and Appellant*,

v.

STATE BAR OF CALIFORNIA, CALIFORNIA COMMITTEE OF BAR
EXAMINERS, and THEIR AGENTS IN THEIR OFFICIAL CAPACITY,
*Defendants and Appellees*.

_____

On Appeal from the Judgment of the United States
District Court for the Northern District of California
The Honorable Phyllis J. Hamilton
District Court Case Number: 4:20-cv-04827-PJH

_____

## PRO BONO

## APPELLANT'S REPLACEMENT OPENING BRIEF

MICHAEL YAMAMOTO LLP
Gregory R. Michael (SBN: 306814)
gmichael@myllp.law
Dorothy C. Yamamoto (SBN: 306817)
dyamamoto@myllp.law
1400 Shattuck Ave., #412
Berkeley, CA 94709
Phone: 510.296.5600
Fax: 510.296.5600

*Attorneys for Plaintiff-Appellant Benjamin Kohn*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ vi

INTRODUCTION ..............................................................................1

STATEMENT OF ISSUES ................................................................1

STATUTORY AND REGULATORY AUTHORITIES ......................2

STATEMENT OF JURISDICTION..................................................2

STATEMENT OF THE CASE ..........................................................3

I. PROCEDURAL HISTORY ....................................................3

II. STATEMENT OF FACTS......................................................4

STANDARD OF REVIEW ..............................................................13

SUMMARY OF THE ARGUMENT ................................................13

ARGUMENT ...................................................................................16

I. THE ELEVENTH AMENDMENT DOES NOT IMMUNIZE THE STATE BAR FROM MR. KOHN'S CLAIMS UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT......................................16

    A. The State Bar Does Not Act as an Arm of the State when Resolving Issues Pertaining to Attorney Admission or Disability Accommodation. ................................................16

        1. The first *Mitchell* factor weighs heavily against a finding of sovereign immunity because the State of California is not legally required to satisfy a money judgment against the State Bar. ................................................17

        2. The second *Mitchell* Factor weighs against a finding of sovereign immunity because the State Bar's attorney admission functions are essentially advisory in nature and do not constitute an essential government function..................20

iii

3. The third, fourth, and fifth *Mitchell* factors also weigh against a finding of sovereign immunity. ..................................23

4. This Court should reach this issue on appeal............................24

B. Congress Abrogated State Sovereign Immunity as to Claims Asserted under Title II of the Americans with Disabilities Act..........25

1. Title II is a congruent and proportional prophylactic response intended by Congress to curb constitutional violations by state actors. ...........................................................26

2. Abrogation is appropriate here even under the district court's flawed analysis because Mr. Kohn's claims give rise to violations of constitutionally protected rights. .....................28

II. THE DISTRICT COURT ERRED BY DISMISSING MR. KOHN'S REHABILITATION ACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION..............................................................33

A. The Parties' Factual Dispute About Whether the State Bar Received Federal Funding Is Not a Jurisdictional Issue Capable of Resolution on a Motion to Dismiss. ......................................34

B. The District Court Further Erred by Failing to Consider Whether Federal Assistance Was Extended to the State Bar Through Indirect Means and by Failing to Allow Jurisdictional Discovery. ....35

III. MR. KOHN'S FIRST AMENDED COMPLAINT PLEADS FACTS SUFFICIENT TO STATE A CLAIM FOR RELIEF. ...................................37

A. Mr. Kohn Plausibly Stated a Claim Under Title II of the Americans with Disabilities Act. .........................................37

1. The State Bar's October 2020 "Forced In-Person Policy" is facially discriminatory. ...........................................39

2. A court can reasonably infer the State Bar's "Timing and Procedure Policies" and "Emergency Policies" cause a disparate impact. ........................................................40

3. The State Bar Failed to Reasonably Accommodate Mr. Kohn's Disabilities..................................................45

iv

4.      Mr. Kohn sufficiently pleaded facts of deliberate indifference to obtain monetary damages under the ADA. ....... 47

B.      Mr. Kohn Plausibly Pled Claims under Section 504 of the Rehabilitation Act .................................................................. 50

C.      Mr. Kohn Plausibly Pled Claims under the California Unruh Act. .... 50

1.      Subsection (b) of the Unruh Act does not limit the scope of subsection (f). ....................................................................... 51

2.      The State Bar engages in businesslike activities and therefore is a "business establishment" under the Unruh Act. ........................................................................................ 54

3.      The State Bar's action of administering the bar exam, including its accommodation-request review process, is subject to the Unruh Act. .......................................................... 57

4.      The California Government Claims Act does not bar Mr. Kohn's Unruh Act claims. ....................................................... 59

IV.      THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING LEAVE TO AMEND. ....................................................................... 59

CONCLUSION ....................................................................................................... 60

STATEMENT OF RELATED CASES ................................................................... 61

CERTIFICATE OF COMPLIANCE ....................................................................... 62

CERTIFICATE OF SERVICE ................................................................................ 63

ADDENDUM .......................................................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ahlmeyer v. Nev. Sys. of Higher Educ.,*
  555 F.3d 1051 (9th Cir. 2009). ..........................................................................59

*Alaska v. EEOC,*
  564 F.3d 1062 (9th Cir. 2009). ..........................................................................26

*Arbaugh v. Y&H Corp.,*
  546 U.S. 500 (2006)............................................................................................33

*Arbogast v. Kansas,*
  789 F.3d 1174 (10th Cir. 2015). ........................................................................36

*Armstrong v. Davis,*
  275 F.3d 849 (9th Cir. 2001). ............................................................................50

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)............................................................................................37

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch,*
  179 F.3d 725 (9th Cir. 1999). .................................................................... 38, 39

*Bd. of Trustees of Univ. of Alabama v. Garrett,*
  531 U.S. 356 (2001)............................................................................................26

*Beentjes v. Placer Cnty. Air Pollution Control Dist.,*
  397 F.3d 775 (9th Cir. 2005). ............................................................. 18, 19, 20

*Belanger v. Madera Unified Sch. Dist.,*
  963 F.2d 248 (9th Cir. 1992). ............................................................................20

*Bell v. Hood,*
  327 U.S. 678 (1946)............................................................................................34

*Board of Regents v. Roth,*
  408 U.S. 564 (1972)............................................................................................28

vi

*Brennon B. v. Superior Court,*
    57 Cal. App. 5th 367 (2020). .................................................................52

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.,*
    149 F.3d 971 (9th Cir. 1998). ...............................................................29

*Broad v. Mannesmann Anlagenbau AG,*
    196 F.3d 1075 (9th Cir. 1999). .............................................................25

*Burks v. Poppy Const. Co.,*
    57 Cal. 2d 463 (1962). ...........................................................................55

*Cal. School for the Blind v. Honig,*
    736 F.2d 538 (9th Cir. 1985). ...............................................................40

*Castle v. Eurofresh, Inc.,*
    731 F.3d 901 (9th Cir. 2013). ...............................................................36

*Chaney v. State Bar of Cal.,*
    386 F.2d 962 (9th Cir. 1967). ...............................................................21

*Chang v. Chen,*
    80 F.3d 1293 (9th Cir. 1996). ...............................................................13

*City of Boerne v. Flores,*
    521 U.S. 507 (1997)................................................................................26

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
    473 U.S. 432 (1985)................................................................................31

*Clark v. State of Cal.,*
    123 F.3d 1267 (9th Cir. 1997). .............................................................25

*Cohen v. City of Culver City,*
    754 F.3d 690 (9th Cir. 2014). ...............................................................38

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999)................................................................................51

*Cooter Gell v. Hartmarx Corp.,*
    496 U.S. 384 (1990)................................................................................13

*Corales v. Bennett*,
567 F.3d 554 (9th Cir. 2009). ...............................................29

*Crowe v. Oregon State Bar*,
989 F.3d 714 (9th Cir. 2021). .................................... passim

*Daniels v. Williams*,
474 U.S. 327 (1986)...............................................................29

*Dare v. California*,
191 F.3d 1167 (9th Cir. 1999). .........................................27

*Douglas v. California Dep't of Youth Auth.*,
271 F.3d 812 (9th Cir. 2001). ...........................................25

*Durning v. Citibank, N.A.*,
950 F.2d 1419 (9th Cir. 1991). ........................... 16, 18, 23

*Duvall v. Cnty. of Kitsap*,
260 F.3d 1124 (2001)........................................... 39, 46, 47

*Eason v. Clark Cnty. School Dist.*,
303 F.3d 1137 (2002)................................................ 17, 18

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
630 F.3d 1153 (2011)...........................................................45

*Gatto v. Cnty. of Sonoma*,
98 Cal. App. 4th 744 (2002). ...........................................57

*Giannini v. Comm. of Bar Examiners of State Bar of Cal.*,
847 F.2d 1434 (9th Cir. 1988). .........................................21

*Giannini v. Real*,
911 F.2d 358 (9th Cir. 1990). ...........................................30

*Gibson v. Cnty. of Riverside*,
181 F. Supp. 2d 1057 (C.D. Cal. 2002). .........................57

*Gilstrap v. United Air Lines, Inc.*,
709 F.3d 995 (9th Cir. 2013). ...........................................50

viii

*Gordon v. State Bar of California*,
   No. 20-CV-06442-LB, 2020 WL 5816580 (N.D. Cal. Sept. 30, 2020). ..... 32, 33

*Hallinan v. Comm. of Bar Examiners of State Bar*,
   65 Cal. 2d 447 (1966). .........................................................................29

*Harrison v. Rancho Mirage*,
   243 Cal. App. 4th 162 (2015). ..............................................................56

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001). .............................................................28

*Hason v. Medical Board of California*,
   279 F.3d 1167 (9th Cir. 2002). .............................................................27

*Hernandez v. City of San Jose*,
   897 F.3d 1125 (9th Cir. 2018). .............................................................29

*Hess v. Port Auth. Trans-Hudson Corp.*,
   513 U.S. 30 (1994) ....................................................................... 16, 18

*Hirsh v. Justs. of Supreme Ct. of State of Cal.*,
   67 F.3d 708 (9th Cir. 1995). ......................................................... 22, 23

*Holz v. Nenana City Pub. Sch. Dist.*,
   347 F.3d 1176 (9th Cir. 2003). .............................................................18

*In re Rose*,
   22 Cal. 4th 430 (2000). ........................................................................21

*Ingraham v. Wright*,
   430 U.S. 651 (1977)..............................................................................29

*Int'l Union of Operating Eng'rs v. Cnty. of Plumas*,
   559 F.3d 1041 (9th Cir. 2009). .............................................................33

*Isbister v. Boys' Club of Santa Cruz*,
   40 Cal. 3d 72 (1985). ...........................................................................54

*Johnson v. California*,
   543 U.S. 499 (2005)..............................................................................50

*Joseph v. State Bar of California*,
    564 F. App'x 302 (9th Cir. 2014). .....................................................23

*K.S. v. Fremont Unified Sch. Dist.*,
    No. C 06-07218 SI, 2007 WL 4287522 (N.D. Cal. Dec. 6, 2007). ....................54

*Keller v. State Bar of California*,
    496 U.S. 1 (1990). ....................................................................21

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019). ..............................................................41

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994). .................................................................33

*Kraft v. Jacka*,
    872 F.2d 862 (9th Cir. 1989). .........................................................28

*Lentini v. California Center for the Arts*,
    370 F.3d 837 (9th Cir. 2004). ..........................................................52

*Lovell v. Chandler*,
    303 F.3d 1039 (9th Cir. 2002). ........................................... 25, 27, 38

*Lupert v. California State Bar*,
    761 F.2d 1325 (9th Cir. 1985). .............................................. 22, 23

*Mathews v. Eldridge*,
    424 U.S. 319 (1976). .................................................................29

*McGary v. City of Portland*,
    386 F.3d 1259 (9th Cir. 2004). ............................................. 37, 40

*McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'r*,
    650 F.App'x 703 (11th Cir. 2016). ...................................................36

*Mitchell v. L.A. Cmty. Coll. Dist.*,
    861 F.2d 198 (9th Cir. 1988). .........................................................16

*Moss v. United States Secret Serv.*,
    572 F.3d 962 (2009). .................................................................17

*Munson v. Del Taco, Inc.*,
   46 Cal. 4th 661 (2009). ................................................................ 52, 53

*Nat'l Ass'n of the Deaf v. State of Florida*,
   980 F.3d 763 (11th Cir. 2020). .................................................... 27, 36

*Nunez by Nunez v. City of San Diego*,
   114 F.3d 935 (9th Cir. 1997). ............................................................31

*O'Connor v. Village Green Owners Assn.*,
   33 Cal. 3d 790 (1983). ................................................................ 54, 55

*Obrien v. Jones*,
   23 Cal. 4th 40 (2000). ........................................................................21

*Orloff v. Los Angeles Turf Club*,
   36 Cal. 2d 734 (1951). .......................................................................57

*Payan v. L.A. Cmty. College Dist.*,
   11 F.4th 729 (9th Cir. 2021). ........................................................ 38, 40

*Perez v. Golden Empire Transit Dist.*,
   209 Cal. App. 4th 1228 (2012). ..........................................................59

*Phiffer v. Columbia River Corr. Inst.*,
   384 F.3d 791 (9th Cir. 2004). ................................................. 14, 25, 27

*Phillips v. Desert Hosp. Dist.*,
   49 Cal. 3d 699 (1989). .......................................................................59

*Plyler v. Doe*,
   457 U.S. 202 (1982). ..........................................................................31

*Polich v. Burlington N., Inc.*,
   942 F.2d 1467 (9th Cir. 1991). ...........................................................59

*Putnam v. Oakland Unified Sch. Dist.*,
   No. C-93-3772CW, 1995 WL 873734 (N.D. Cal. June 9, 1995). ......................40

*Ray v. Cnty. of Los Angeles*,
   935 F.3d 703 (9th Cir. 2019) .......................................................... 16, 20

xi

*Regents of the Univ. of California v. Doe*,
519 U.S. 425 (1997)..................................................................18

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004). .................................................. 33, 34

*Santa Cruz Homeless Union v. Bernal*,
514 F. Supp. 3d 1136 (N.D. Cal. 2021).........................................32

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*,
343 F.3d 1036 (9th Cir. 2003). .................................................. 20, 33

*Scheuer v. Rhodes*,
416 U.S. 232 (1974)..................................................................37

*Schneider v. Cal. Dep't of Corr.*,
151 F.3d 1194 (9th Cir. 1998). ...................................................13

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996)....................................................................18

*Serrano v. Francis*,
345 F.3d 1071 (9th Cir. 2003). ...................................................31

*Sheller v. Superior Court*,
158 Cal. App. 4th 1697 (2008). ..................................................21

*Singleton v. Wulff*,
428 U.S. 106 (1976)..................................................................24

*Stoumen v. Reilly*,
37 Cal. 2d 713 (1951). ..............................................................57

*Streit v. Cnty. of Los Angeles*,
236 F.3d 552 (9th Cir. 2001). .....................................................20

*Sun Valley Gas., Inc. v. Ernst Enters.*,
711 F.2d 138 (9th Cir. 1983). ............................................ 14, 34, 36

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002)..................................................................37

*Tarabochia v. Adkins*,
766 F.3d 1115 (9th Cir. 2014). ..........................................................24

*Tennessee v. Lane*,
541 U.S. 509 (2004)............................................................ 25, 26, 27

*Thomas v. Nakatani*,
309 F.3d 1203 (9th Cir. 2002). ..........................................................27

*Thomlison v. City of Omaha*,
63 F.3d 786 (8th Cir. 1995). ..............................................................36

*Thompson v. Runnels*,
705 F.3d 1089 (9th Cir. 2013). ..........................................................24

*Thornhill Publ'g Co. v. Gen. Tel. Co.*,
594 F.2d 730 (9th Cir. 1979). ............................................................34

*Toledo v. Sanchez*,
454 F.3d 24 (1st Cir. 2006)................................................................27

*Tritchler v. Cnty. of Lake*,
358 F.3d 1150 (9th Cir. 2004). .................................................. 17, 25

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
477 U.S. 597 (1986)...........................................................................36

*United States v. Georgia*,
546 U.S. 151 (2006)............................................................ 25, 26, 28

*United States v. Northrop Corp.*,
59 F.3d 953 (9th Cir. 1995). ..............................................................25

*Updike v. Multnomah Cnty.*,
870 F.3d 939 (9th Cir. 2017). ............................................................35

*Warfield v. Peninsula Golf & Country Club*,
10 Cal. 4th 594 (1995). ............................................................ 55, 57, 58

*Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*,
24 F.3d 56 (9th Cir. 1994). ................................................................28

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000). ..........................................................33

*Wolff v. McDonnell*,
418 U.S. 539 (1974)............................................................................29

*Wong v. Regents of Univ. of Cal.*,
192 F.3d 807 (9th Cir. 1999). ............................................................45

*Yates v. East Side Union High Sch. Dist.*,
No. 18-CV-02966-JD, 2019 WL 721313 (N.D. Cal. Feb. 20, 2019)................57

## STATUTES

28 U.S.C. § 1291. ..................................................................................2

28 U.S.C. § 1331. ..................................................................................2

28 U.S.C. § 1367. ..................................................................................2

29 U.S.C. § 794(b)(1)(B). ....................................................................15

29 U.S.C. § 794. ...............................................................................3, 35

42 U.S.C. § 12131. ................................................................................3

42 U.S.C. § 12132. ..............................................................................38

42 U.S.C. § 12202. ..............................................................................25

Cal. Bus. & Prof. Code § 6001. ................................................ 19, 23, 46

Cal. Bus. & Prof. Code § 6008. ...........................................................21

Cal. Bus. & Prof. Code § 6008.1. ................................................. 13, 19

Cal. Bus. & Prof. Code § 6008.2. .........................................................21

Cal. Bus. & Prof. Code § 6060. ...........................................................58

Cal. Bus. & Prof. Code § 6063. ...........................................................19

Cal. Bus. & Prof. Code § 6140. ...........................................................19

Cal. Civ. Code § 51 ..........................................................................3, 51

Cal. Civ. Code § 52(a). ....................................................................53

Cal. Gov. Code § 11135 ..................................................................3

Cal. Gov. Code § 12944 ...................................................................3

Cal. Gov. Code § 945.4 ..................................................................59

## RULES

Cal. State Bar Rules, rule 4.2 ........................................................21

Fed. R. Civ. P. 12(b)(1) ...........................................................3, 34

Fed. R. Civ. P. 12(b)(6) ...........................................................3, 37

## REGULATIONS

28 C.F.R. § 36.309(b)(iv) ...............................................................44

28 C.F.R. Pt. 35, App. A. ...............................................................45

28 C.F.R. Pt. 36, App. A. ...............................................................46

29 C.F.R. § 1630.2(k)(2) ................................................................30

29 C.F.R. § 35.130. .......................................................................45

45 C.F.R. § 84.3(f). .......................................................................36

# INTRODUCTION

Appellees the State Bar of California, Committee of Bar Examiners, and their agents in their official capacities (collectively, the "State Bar") have created a fundamentally flawed, unfair, and overly burdensome process for addressing requests for disability accommodations on the California Bar Exam. Its methods, in this case, resulted in the State Bar unreasonably refusing accommodations recommended by several physicians responsible for carrying out Appellant Benjamin Kohn's ("Mr. Kohn") treatment for autism and other physical and visual conditions. Unable to find equal footing on the bar exam, Mr. Kohn was forced to suffer through multiple iterations of it until he eventually passed in October 2020. The State Bar refuses to acknowledge any wrongdoing or remedy the flaws of its procedures. Instead, it claims it has the right to violate federal and state anti-discrimination laws with impunity. It cannot.

# STATEMENT OF ISSUES

1.　　Whether the State Bar lacks Eleventh Amendment immunity when it violates Title II of the Americans with Disabilities Act ("Title II").

2.　　Whether the district court has subject matter jurisdiction over Mr. Kohn's federal claims under Section 504 of the Rehabilitation Act ("Section 504") against the State Bar.

1

3.      Whether Mr. Kohn alleged facts stating claims for relief under Title II, Section 504, and the California Unruh Civil Rights Act ("Unruh Act").

4.      Whether the district court abused its discretion by denying Mr. Kohn leave to amend his First Amended Complaint ("FAC").

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over Mr. Kohn's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Mr. Kohn's state law claims pursuant to 28 U.S.C. § 1367.[1] On November 25, 2020, Mr. Kohn filed timely a Notice of Appeal of the district court's October 27, 2020 Order Granting Motion to Dismiss and the associated Judgment. 1-ER-2–19; 6-ER-1208. Accordingly, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

---

[1] As discussed below, the district court incorrectly held that it lacked subject matter jurisdiction over Mr. Kohn's Section 504 claims. *See*, *infra*, Section II.

2

# STATEMENT OF THE CASE

## I.  PROCEDURAL HISTORY

Appellant Mr. Kohn filed his initial complaint in the U.S. District Court for the Northern District of California on July 18, 2020. 6-ER-1213. He sought declaratory and injunctive relief and monetary damages arising from the State Bar's alleged violations of Title II, 42 U.S.C. § 12131, *et seq.*; Section 504, 29 U.S.C. § 794; California Government Code Sections 11135, *et seq.*, and 12944, *et seq.*; and the Unruh Act, Cal. Civ. Code § 51(f). *See id.* On September 7, 2020, Mr. Kohn filed his FAC, which asserts the same claims and alleges certain additional facts. 2-ER-278–312. Mr. Kohn moved for a preliminary injunction as to each version of his complaint, which the district court denied. 6-ER-1213–17.

On October 27, 2020, the district court granted the State Bar's motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6), without the benefit of a hearing, and without granting Mr. Kohn leave to amend. 1-ER-3–19. The district court held that Mr. Kohn's Title II claims were barred by the Eleventh Amendment; that it lacked subject matter jurisdiction over Mr. Kohn's Section 504 claims on account of the State Bar's assertion that it does not receive direct federal

3

funding; and that the Unruh Act does not apply to government entities.[2] *Id.* On

October 27, 2020, the district court entered a final judgment in favor of the State

Bar, and Mr. Kohn appealed. 1-ER-2; 6-ER-1208.

## II.    STATEMENT OF FACTS

Mr. Kohn is a University of Iowa law school graduate—and a now

California-barred attorney—who suffers or has suffered from a number of

distinctly diagnosed conditions, the most relevant including: autism; keratoconus;

dry eye syndrome; severe gastroparesis and postoperative dysphagia; pelvic floor

dyssynergia and IBS-C; myofascial pain syndrome; motor delays; scapular

dyskinesis; occipital neuralgia; cervicalgia; and medication-induced

immunodeficiencies with respect to COVID-19 risk in order to treat various

immunological and other health conditions.[3] 2-ER-287—289; 3-ER-373

(discussing Mr. Kohn's immunocompromised status).

To this day, Mr. Kohn's disabilities are still developing and evolving. 2-ER-

287:27. For instance, Mr. Kohn was not diagnosed with certain physical

disabilities until late 2017/early 2018, and which ended up affecting his other

---

[2] Mr. Kohn does not contest the district court's dismissal of his requests for declaratory and injunctive relief as moot or its dismissal of his claims asserted under California Government Code Sections 11135, *et seq.*, and 12944, *et seq.*

[3] At the time Mr. Kohn filed the FAC, Mr. Kohn had not yet passed the October 2020 California Bar Exam. *See* 2-ER-22.

4

disabilities as later discovered in 2018 and 2019. 3-ER-354—355. Similarly, Mr.

Kohn's neuroprocessing speeds from his autism have worsened over time

including in the years just prior to his filing of the FAC. 2-ER-44. Despite these

challenges, Mr. Kohn continues to receive necessary medical treatment for his

conditions. 2-ER-287:26—289:10.

As a result of his medical conditions, Mr. Kohn petitioned the State Bar for

disability accommodations for the July 2018, February 2019, February 2020, and

October 2020 California Bar Exams. *See e.g.*, 2-ER-293:29—2-ER-294:1; 2-ER-

298:15-16.

### The State Bar's Policies for Reviewing Accommodation Requests

For each exam (except the alterations for the October 2020 exam noted

below), the State Bar's standard policies for receiving and reviewing

accommodation requests for all applicants included the following ("**Timing and

Procedure Policies**"):

1. the State Bar takes *a minimum* of sixty days for "initial processing" of a

   petition for accommodation (2-ER-296:8-9; 3-ER-398 [Rule 4.88(A)])[4];

---

[4] In comparison, the National Conference of Bar Examiners (NCBE) decided Mr.
Kohn's petition for testing accommodations on the Multistate Professional
Responsibility Exam (MPRE) in less than thirty days. 2-ER-296:26–28.

2. the State Bar recommends requests be made "at least six months" prior to the exam (2-ER-296:10–12; *see also* 3-ER-396 [Rule 4.84(B)]);

3. there is no particular process for deciding how to grant, modify, or deny requests (3-ER-394 [Rule 4.81(A): "Petitions . . . are processed on a case-by-case basis"]);

4. there is no requirement to provide detailed medical explanations or other reasons for denying or modifying a request (*see* 2-ER-299:28—300:1; 3-ER-398 [Rule 4.88(D)]);

5. denied requests must be appealed by the earlier date of either ten days after the date of the denial or 30-days prior to the exam deadline (2-ER-299:27-28; 3-ER-398—399 [Rule 4.90(A)-(B)])[5]; and

6. the State Bar has no deadline to review an appeal; it reviews appeals "as soon as practicable" (2-ER-294:17–18; 3-ER-399 [Rule 4.90(D)]).[6]

Due to the COVID-19 pandemic, the California Supreme Court delayed the July 2020 bar exam first to September 2020, and later to October 2020. 3-ER-

---

[5] Mr. Kohn did not receive the State Bar's denial letter until up to five days after the date of its mailing, curtailing his ability to appeal. 2-ER-297:24–26.

[6] In comparison, The Iowa Board of Law Examiners decided Mr. Kohn's testing accommodation appeal for the July 2019 Iowa Bar Exam within approximately three business days. 2-ER-296:23–25.

401—402. On July 16, 2020, the California Supreme Court also announced that the exam could be administered online. *Id.*

As these announcements from the California Supreme Court unfolded, the State Bar decided to implement the following policies, as alleged by Mr. Kohn, (collectively "**Emergency Policies**"):

1. "applicants with disabilities that could [otherwise] be accommodated via online testing . . . will be required to test in person at test centers to receive their accommodations, if the Committee determines any accommodations do not 'lend themselves to online testing'" ("**Forced In-Person Policy**") (2-ER-295:10–13); and

2. the appeal deadline was moved to the earlier date of ten days after a denial or by August 13, 2020, approximately sixty days before the October 2020 exam ("**Emergency Deadline Policy**") (2-ER-294:22–23).

Notably, for the October 2020 exam, the State Bar did *not* modify the deadlines to petition for disability accommodations even though the pandemic had decreased or eliminated the availability of physicians to prepare medical reports and conduct in-person testing or exams needed to support disability accommodation requests. *See* 2-ER-297:8–21. The State Bar also failed to comply with their own sixty-day estimated review time, while simultaneously creating a shorter deadline for applicants to appeal adverse decisions. *See* 2-ER-294:6-16.

### Mr. Kohn's Requests for Accommodations

For each bar exam, Mr. Kohn submitted ample medical evidence from both his treating physician, Dr. Dresden, as well as other experts for his various disabilities. *See generally* 5-ER-978—6-ER-1207 (containing medical evidence and summaries submitted by Mr. Kohn to the State Bar in support of his requests for accommodation for each exam). For the February 2019, February 2020, and October 2020 exams, the State Bar failed to grant all of Mr. Kohn's reasonable requests for accommodations. 2-ER-299:25—300:6 (denying several February 2019 and 2020 requests); 2-ER-315—316 (heavily mischaracterizing while denying Mr. Kohn's October 2020 requests for accommodation).

For the February 2019 exam, the accommodation requests that the State Bar denied Mr. Kohn included:

(1) 150% extra time on the essay sections of the exam which was to be administered in a way that did not lengthen the standard test day; *see* 2-ER-290:14–15; 5-ER-901—5-ER-941 (documentation accompanying Mr. Kohn's February 2019 accommodation requests and the State Bar's denials of the same);

(2) Stop-the-Clock Breaks for meals of up to 30-minutes for each 90-minutes of test time that day, in lieu of a 60-minute standard lunch break, which can be unscheduled and timed around symptoms; and

8

(3) at the State Bar's choice, one of the following: (a) provision of a Herman Miller Embody Chair as an auxiliary aid; (b) permission to bring and leave his own ergonomic equipment in the exam room overnight at the State Bar's risk for loss, theft, or damage; or (c) a hotel room at the test center beginning the night before the exam. [7]

In support of these request, Mr. Kohn submitted substantial medical evidence from his primary care physician and treating physicians. *E.g.*, 2-ER-291:1–21; 2-ER-292:21–25. Nevertheless, the State Bar denied these reasonable requests (and others), mischaracterized several of the requests, and offered as the sole "substantial" explanation in the denial letter that "the documentation you and your specialist provided does not support those requests." 2-ER-299:28—300:1.

Mr. Kohn received the denial letter via mail, which cut into his ten-day appeal deadline and gave him insufficient time for him to gather additional expert opinions to support his appeal. 2-ER-299:27–28. Notably, the denial letter failed to disclose whether the State Bar had consulted any expert, suggesting that the State Bar did not consult any expert when denying the requests. 2-ER-303:13–14. On

---

[7] These are only some of the reasonable accommodation requests denied by the State Bar. The FAC includes excerpts—not all—of Mr. Kohn's accommodation requests for each bar exam. *See generally* 3-ER-393—4-ER-776. The State Bar also mischaracterized several of these requests in their arguments to the district court, which the court adopted in its order below. The full (and accurate) requests are set forth in the record and can be added to the complaint upon amendment.

9

appeal, the State Bar denied "any duty to provide a detailed explanation to each denial" and only addressed a couple of the denied requests. 2-ER-284:13–19.

For the February 2020 exam, Mr. Kohn requested the above accommodations (and others identical to his February 2019 request), which the State Bar again denied (while again mischaracterizing several requests). 2-ER-300:5–6; *see also* 5-ER-943—5-ER-977 (submission materials for Mr. Kohn's February 2020 requests and the State Bar's denials of same). This time, the State Bar had one non-treating expert review Mr. Kohn's accommodation request who reviewed only "new" medical evidence Mr. Kohn had submitted instead of Mr. Kohn's entire file. 2-ER-283 ("[m]uch of the information [the non-treating expert] claimed to be missing was amongst the file at the time of their review"); 2-ER-303:24–25 (". . . relying on generally one non-treating expert . . . who they gave only cherry-picked excerpts from Plaintiff's [file]"). The State Bar relied on the sole, non-treating expert who recommended against certain requested accommodations, and it did so without providing any explanation of why or how the opinion of the State Bar's expert was given more weight than the opinions of Mr. Kohn's experts. 2-ER-282:3–6.

Similarly, for the October 2020 exam, Mr. Kohn requested various reasonable accommodations including requests that proctors test negative for COVID-19 and virtual proctor supervision through CCTV-like onsite/offline video

10

surveillance (as opposed to in-person supervision) when Mr. Kohn is eating or drinking and unable to wear a mask. *See generally* 3-ER-393—4-ER-776 (containing Mr. Kohn's request for accommodations and subsequent modifications in light of COVID-19 and in-person concerns for the October 2020 exam).

Mr. Kohn submitted his initial petition on March 19, 2020, along with medical evidence, which he further supplemented in the following months as requested by the State Bar and as the COVID-19 situation progressed. *See* 2-ER-294:2–5; 2-ER-26–27 (report by Dr. Clarke warning that any forced in-person testing ". . . would expose [Mr. Kohn] to numerous disadvantages compared to other candidates, including greater coronavirus exposure risks, [and] greater financial barriers and costs to accessing the exam . . . .").

In response, the State Bar delayed for months before processing Mr. Kohn's petition. 2-ER-293:29—294:23; 2-ER-279:13. Even more unacceptably, the State Bar informed Mr. Kohn that they would not be able to provide him with a decision until August 21, 2020, which was approximately one week *after* the appeal deadline of August 13, 2020, which would preclude Mr. Kohn from administratively appealing any denial. 2-ER-294:19–23.

Ultimately, the State Bar completed its review of Mr. Kohn's March 2020 petition on August 27, 2020, denied several of Mr. Kohn's reasonable accommodation requests (including his request that proctors test negative for

11

COVID-19 and virtual supervision in light of his immunodeficiencies), and forced Mr. Kohn to take the test in person. *See* 2-ER-279:17–20; 2-ER-315 (assigning Mr. Kohn to the "in-person test center provided by the Committee").

In denying Mr. Kohn's requests, the State Bar relied on two non-treating experts specialized in psychology and visual disabilities to review all of Mr. Kohn's requests including his requests based on his physical disabilities such as his immunodeficiencies. *See* 2-ER-282. The psychologist provided numerous inaccurate summaries of Mr. Kohn's requests and mischaracterizations of the medical evidence Mr. Kohn offered. 2-ER-282:12–14. The psychologist also had a very poor comprehension of background facts even though they claimed to have read the entire file. 2-ER-282:15–19. Perhaps most egregiously, the psychologist appeared to rely heavily on prior determinations of accommodation requests for prior exams to the blatant ignorance of the medical evidence and legal standards of reasonable accommodations. 2-ER-282:20—283:12.

Despite these glaring deficiencies in the quality of the State Bar's expert, the State Bar relied on its experts and rejected numerous expert reports provided by Mr. Kohn. As a direct result of the State Bar's failures (the degree of which the above only provides a glimpse), Mr. Kohn was forced to delay his career for years and costing him thousands of dollars in studying and registering for bar exams where he was not appropriately accommodated. 2-ER-305–307. Furthermore, for

the October 2020 exam, he endured costly additional expenses and burdens such as hotel expenses and ergonomic equipment transportation because of the forced in-person testing coupled with the denied reasonable accommodation requests. *Id.*

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of a complaint for reasons of sovereign immunity and failure to state a claim upon which relief can be granted. *Crowe v. Oregon State Bar*, 989 F.3d 714, 724 (9th Cir. 2021). "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1196 (9th Cir. 1998) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996)); *see also Cooter Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("[a] district court . . . abuse[s] its discretion if it based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence").

## SUMMARY OF THE ARGUMENT

The State Bar is not entitled to Eleventh Amendment sovereign immunity as to Mr. Kohn's Title II claims for two reasons. First, the State Bar failed to establish that it acts as an arm of the State of California when resolving issues pertaining to attorney admission or disability accommodation. Not only does the State Bar maintain its own treasury separate from that of the state, but state law disavows any state responsibility for the State Bar's debts. Cal. Bus. & Prof. Code § 6008.1.

13

The State Bar's actions are neither binding on the California Supreme Court, nor subject to substantial oversight by it. It is also a distinct public corporation, may sue or be sued, and may own property in its own name.

Second, even if the State Bar is an arm of the state, this Court has held that Congress validly abrogated state sovereign immunity as to claims arising properly under Title II. *E.g.*, *Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791, 792 (9th Cir. 2004). The State Bar's entitlement to sovereign immunity is not, as the district court concluded, dependent on whether Mr. Kohn's Title II claims arise from conduct violating the Fourteenth Amendment. Nevertheless, the State Bar's conduct in this case did in fact violate Mr. Kohn's due process and equal protection rights.

The district court's erroneous dismissal of Mr. Kohn's Section 504 claims for lack of subject matter jurisdiction was predicated on three, fundamental misapplications of law. First, Mr. Kohn's Section 504 claims cannot be validly dismissed under Rule 12(b)(1) because they are neither "immaterial and made solely for the purpose of obtaining jurisdiction," nor "wholly insubstantial and frivolous." *See Sun Valley Gas., Inc. v. Ernst Enters.*, 711 F.2d 138, 140 (9th Cir. 1983). Second, the State Bar's liability under Section 504 does not depend, as the district court incorrectly held, on whether the State Bar "affirmatively and directly" received federal funding, 1-ER-19, but on whether the State Bar received such

14

funding through direct *or indirect* means. 29 U.S.C. § 794(b)(1)(B). Third, the State Bar's receipt of federal funding is a substantive element of Mr. Kohn's Section 504 claims, and it is therefore a factual issue incapable of being resolved on a motion to dismiss, absent jurisdictional discovery.

As to Mr. Kohn's Unruh Act claims, the district court incorrectly concluded that, categorically, "government entities are not . . . subject to the Unruh Act." 1-ER-17. California courts, the arbiters of California law, have rejected the district court's analysis. *See, e.g.*, *Gatto v. Cnty. of Sonoma*, 98 Cal.App.4th 744, 768 (2002). The district court's dismissal of Mr. Kohn's Unruh Act claims for that reason was erroneous, and no other justification exists for its dismissal of Mr. Kohn's case with prejudice and without leave to amend. Accordingly, this Court should reverse the decision of the district court and remand with instructions to permit Mr. Kohn to file a second amended complaint.

## ARGUMENT

## I. THE ELEVENTH AMENDMENT DOES NOT IMMUNIZE THE STATE BAR FROM MR. KOHN'S CLAIMS UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT.

The district court erred by dismissing Mr. Kohn's Title II claims as barred by the Eleventh Amendment for two, independent reasons discussed in detail below.

### A. The State Bar Does Not Act as an Arm of the State when Resolving Issues Pertaining to Attorney Admission or Disability Accommodation.

The Eleventh Amendment to the U.S. Constitution bars, with few exceptions, nonconsenting States from suit by private individuals in federal court. *E.g.*, *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 72–73 (2000). While sovereign immunity under this Amendment extends to each "arm of the state," it does not extend to all state-created or state-run entities. *Crowe*, 989 F.3d at 714; *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir. 1991). Indeed, a single entity may act as an arm of the state in some contexts, while not in others. *Ray v. Cnty. of Los Angeles*, 935 F.3d 703, 710 (9th Cir. 2019).

This Court employs the following five-factor test, established by *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) ("*Mitchell*"), to determine whether an entity acts an arm of the state:

16

> [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power to take property in its own name or only the name of the state, and [5] the corporate status of the entity.

*See Crowe*, 989 F.3d at 730. The entity claiming sovereign immunity "bear[s] the burden of proving the facts that establish its immunity under the Eleventh Amendment." *ITSI T.V. Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1292 (9th Cir. 1993).

On a motion to dismiss, this Court analyzes the issue of sovereign immunity under Rule 12(b)(6). *Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1153–54 (9th Cir. 2004) (recognizing sovereign immunity as an affirmative defense, not a jurisdictional matter). As such, this Court should accept as true all well pleaded allegations of the complaint for purposes of its analysis. *See, e.g.*, *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (2009). For the reasons set forth below, the State Bar has not met its burden of establishing it is entitled to sovereign immunity.

> **1. The first *Mitchell* factor weighs heavily against a finding of sovereign immunity because the State of California is not legally required to satisfy a money judgment against the State Bar.**

"The first *Mitchell* factor—whether a money judgment against the government entity would be satisfied out of state funds—is the most important." *Eason v. Clark Cnty. School Dist.*, 303 F.3d 1137, 1141 (2002); *see also, e.g.*,

17

*Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 778 (9th Cir. 2005). Although "[t]he Eleventh Amendment does not exist solely . . . to prevent federal-court judgments that must be paid out of a State's treasury," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) (quotation omitted), "the vulnerability of the [s]tate's purse [i]s the most salient factor in Eleventh Amendment determinations." *Hess*, 513 U.S. at 48-49 ("[T]he vast majority of Circuits . . . have generally accorded this factor dispositive weight."); *see also Durning*, 950 F.2d at 1424; *Crowe*, 989 F.3d at 731.

In evaluating this factor, "the relevant inquiry is whether [the state] will be legally required to satisfy any monetary judgment obtained against the [entity claiming immunity]." *Eason*, 303 F.3d at 1142; *see also Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1182 (9th Cir. 2003). "[T]he fact that the state may ultimately *volunteer* to pay the judgment . . . is immaterial." *Beentjes*, 397 F.3d at 780 (emphasis in original). Likewise, whether the defendant entity would have the "practical ability to pay" for a monetary judgment is of no consequence. *Durning*, 950 F.2d at 1424 n. 2; *see also Beentjes*, 397 F.3d at 779 (citing *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 431 (1997)).

Here, the first *Mitchell* factor weighs heavily against a finding of sovereign immunity because the State of California is not legally liable for a money judgment against the State Bar. Section 6008.1 of the California Business & Professions

18

Code provides that "[n]o bond, note, debenture, evidence of indebtedness, mortgage, deed of trust, assignment, pledge, contract, lease, agreement, or other contractual obligation of the State Bar shall . . . create a debt or other liability of the state nor of any entity other than the State Bar." Cal. Bus. & Prof. Code § 6008.1. Instead, the State Bar is responsible, solely, for satisfying its own debts. *Id; see also Crowe*, 989 F.3d at 731. Thus, under governing state law, the State Bar cannot establish that the State of California will be required to pay for a money judgment entered against the State Bar.

Further bolstering the State Bar's financial independence, California law empowers the State Bar to collect annual licensee fees and "to raise . . . additional revenue by any lawful means." Cal. Bus. & Prof. Code §§ 6001, 6140; *see also Crowe*, 989 F.3d at 731 (holding that the collection of bar dues weighs against immunity); *Beentjes*, 397 F.3d 780 (noting that a defendant's discretion to replenish its budget weighed against immunity). The State Bar exercises this power by raising more than $200,000,000 annually through the collection of mandatory bar fees, voluntary donations, exam fees, grants, and other revenue. 2-ER-104. These funds are all paid into the "treasury of the State Bar," not to the State of California. Cal. Bus. & Prof. Code § 6063. Accordingly, this factor cuts considerably, if not determinatively, against the State Bar's claim of sovereign immunity.

     **2.**      **The second *Mitchell* Factor weighs against a finding of sovereign immunity because the State Bar's attorney admission functions are essentially advisory in nature and do not constitute an essential government function.**

The second *Mitchell* factor—whether the State Bar performs central governmental functions—asks this Court to evaluate whether the State Bar's function addresses "a matter of statewide rather than local or municipal concern," *see Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 253 (9th Cir. 1992), and "the extent to which the state exercises centralized governmental control over the entity." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1044 (9th Cir. 2003); *see also Beentjes*, 397 F.3d at 782. In doing so, this Court looks to the entity's particular function at issue in the case. *Ray*, 935 F.3d at 710 (citing *Streit v. Cnty. of Los Angeles*, 236 F.3d 552 (9th Cir. 2001)).

In *Crowe*, this Court held that the Oregon State Bar is not an arm of the state for purposes of the Eleventh Amendment. *Crowe*, 989 F.3d at 732. In evaluating the second *Mitchell* factor, this Court acknowledged that the Oregon bar serves important government functions, including the administration of bar exams and attorney admissions, attorney discipline, resignations, and reinstatements. *Id.* It further observed that the Oregon Supreme Court exerts control over the state bar's bylaws, approves the rules of professional conduct, reviews the state bar's annual financials, and approves budgets for certain state bar activities. *Id.* Nevertheless, this Court concluded that the second factor weighs slightly against immunity

because the Oregon bar's services are "essentially advisory in nature," with the ultimate authority still resting with Oregon Supreme Court. *Id.* (quoting *Keller v. State Bar of California*, 496 U.S. 1, 4 (1990)). As such, the Oregon State Bar did not itself perform a central government function. *Id.*

Here, the second *Mitchell* factor militates against a finding of sovereign immunity for the same reasoning set forth in *Crowe*. To be sure, the State Bar performs important and valuable services on behalf of the state judiciary. Cal. Bus. & Prof. Code §§ 6008; 6008.2. Under California law, however, the California Supreme Court retains the ultimate authority to resolve issues pertaining to attorney admission, discipline, and the rules of professional conduct. Cal. State Bar Rules, rules 4.2; Cal. Rules of Ct., rule 9.13(d); *Obrien v. Jones*, 23 Cal. 4th 40, 47 (2000); *Chaney v. State Bar of Cal.*, 386 F.2d 962, 966 (9th Cir. 1967).[8] The State Bar's actions are therefore advisory in nature and it does not serve a central government function for purposes of the *Mitchell* test.

Despite spinning off some of its programs into the "California Lawyer's Association" in 2017, the State Bar remains an "integrated bar" for purposes of this Court's *Mitchell* test because all California lawyers must be a member of the bar

---

[8] *See also In re Rose*, 22 Cal. 4th 430, 436 (2000); *Giannini v. Comm. of Bar Examiners of State Bar of Cal.*, 847 F.2d 1434, 1435 (9th Cir. 1988); *Sheller v. Superior Court*, 158 Cal. App. 4th 1697, 1709 (2008).

and pay annual fees. Cal. Const., art. VI, § 9 (referring to all California attorneys as "members" of the State Bar); *see also Crowe*, 989 F.3d at 720. The State Bar's recent efforts to change statutory references from "members" to "licensees" is a matter of form, not substance. *See Keller*, 496 U.S. at 11–12 (assessing the State Bar's functions, not word choice). Furthermore, it is this Court's prerogative, not the State of California's, to decide the boundaries of the Eleventh Amendment. *See Crowe*, 989 F.3d at 730.

Further, the State Bar's particular conduct at issue in this case—its actions taken in response to disability accommodation requests on the California Bar Exam—is not a matter of statewide concern but of private concern to disabled applicants. Standing in stark contrast to the adoption and enforcement of ethical rules governing the practice of law in California, *Hirsh v. Justs. of Supreme Ct. of State of Cal.*, 67 F.3d 708, 711 (9th Cir. 1995) (concerning attorney discipline), and the promulgation of general requirements for admission to the bar, *Lupert v. California State Bar*, 761 F.2d 1325, 1327 (9th Cir. 1985) (concerning a state law requirement of the First-Year-Law-Student Exam), there is no mechanism by which the public can scrutinize the State Bar's accommodation decisions.[9]

_____

[9] This Court did not assess, in *Hirsh* or *Lupert*, whether the State Bar acts as an arm of the state when deciding whether to accommodate disabled applicant on the

Accordingly, the second *Mitchell* factor weighs against a finding of sovereign immunity.

### 3. The third, fourth, and fifth *Mitchell* factors also weigh against a finding of sovereign immunity.

The remaining *Mitchell* factors ask this Court to examine whether the State Bar may sue or be sued, if it may take property in its own name, and whether it exists as a corporation independent from the state. *See Crowe*, 989 F.3d at 730. The answer, here, is again in the affirmative on all fronts. California law provides unequivocally that the State Bar "may sue and be sued." Cal. Bus. & Prof. Code § 6001. It also affords the State Bar the right to "[o]wn, hold, use, manage and deal in and with real and personal property." Cal. Bus. & Prof. Code § 6001(c). Lastly, the State Bar is a "public corporation," independent from the State of California. Cal. Bus. & Prof. Code § 6001; *see also Durning*, 950 F.2d at 1419 (recognizing that a state's appointment of the defendant's board of directors does not render it

---

California Bar Exam. *Hirsh*, 67 F.3d at 711; *Lupert*, 761 F.2d at 1327. As such, those decision are inapposite and, in any event, do not offer guidance on how the *Mitchell* test is to be applied to the State Bar. Similarly, this Court's unpublished memorandum opinions affirming, without analysis, that the State Bar is entitled to sovereign immunity are neither binding, nor instructive. *See Joseph v. State Bar of California*, 564 F. App'x 302, 303 (9th Cir. 2014); *Viriyapanthu v. State Bar of California*, 813 F. App'x 312, 313 (9th Cir. 2020) , *cert. denied*, 141 S. Ct. 1275 (2021).

an arm of the state). Accordingly, this Court should reverse the district court's ruling dismissing Mr. Kohn's Title II claims under Eleventh Amendment.

### 4. This Court should reach this issue on appeal.

In the proceedings below, the district court and the parties appear to have assumed, without application of the *Mitchell* test, that the State Bar constitutes an arm of the state. *See* 1-ER-9. Mr. Kohn did not waive application of the *Mitchell* test, however, because the district court necessarily reached the threshold issue of whether the State Bar is entitled to sovereign immunity as a general matter. *See* 1-ER-9 ("This immunity extends to defendants, which are state agencies."); *Tarabochia v. Adkins*, 766 F.3d 1115, 1128 (9th Cir. 2014).

Even if a waiver occurred, this Court should still apply the *Mitchell* test in this appeal because (1) this Court is not bound by tacit assumptions about governing legal principles, *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013); (2) this Court's decision in *Crowe*, 989 F.3d at 714, was decided after the district court's ruling and appellate review of this issue is necessary to prevent a miscarriage of justice; and (3) the facts most pertinent to the *Mitchell* analysis (i.e., that the State Bar has a separate treasury from the state) was disclosed in the State Bar's motion to dismiss, sufficiently developing any factual record needed to conduct the analysis under *Mitchell*. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076, fn. 3 (9th

24

Cir. 1999); *United States v. Northrop Corp.*, 59 F.3d 953, 957, fn. 2 (9th Cir.

1995). Thus, this Court should not hesitate to reach this issue on appeal.

> **B.    Congress Abrogated State Sovereign Immunity as to Claims Asserted under Title II of the Americans with Disabilities Act.[10]**

Congress may abrogate a state's Eleventh Amendment immunity by (1)

"unequivocally express[ing] its intent to abrogate that immunity;" and (2) "act[ing]

pursuant to a valid grant of constitutional authority." *Tennessee v. Lane*, 541 U.S.

509, 518 (2004); *see also Kimel*, 528 U.S. at 640. Title II easily answers the first of

these questions in the affirmative. *Clark v. State of Cal.*, 123 F.3d 1267, 1271 (9th

Cir. 1997) (citing 42 U.S.C. § 12202); *see also Georgia*, 546 U.S. at 154; *Lane*,

541 U.S. at 518; *Lovell v. Chandler*, 303 F.3d 1039, 1050 (9th Cir. 2002). Thus,

the issue of abrogation rests on whether Congress acted validly pursuant to Section

5 of the Fourteenth Amendment when it enacted Title II. *See Alaska v. EEOC*, 564

F.3d 1062, 1067–68 (9th Cir. 2009).

There are two ways in which Congress can validly abrogate sovereign

immunity through use of its Section 5 powers. First, "Congress may prohibit and

---

[10] The State Bar may not assert sovereign immunity as to Mr. Kohn's Section 504 or Unruh Act claims for the first time on appeal from entry of a final judgment. *See* 2-ER-61–94; *Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1153 (9th Cir. 2004) (recognizing the Eleventh Amendment is a waivable, affirmative defense). Furthermore, the State of California waived its immunity with respect to Section 504 claims. *See Douglas v. California Dep't of Youth Auth.*, 271 F.3d 812, 819 (9th Cir.), amended, 271 F.3d 910 (9th Cir. 2001); *Phiffer*, 384 F.3d at 793.

provide a remedy for conduct that actually violates the [Fourteenth] Amendment." *Id.* (citing *Georgia*, 546 U.S. at 158). Second, legislation "which deters or remedies constitutional violations can fall within the sweep of Congress' [Section 5] enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *Alaska*, 564 F.3d at 1067–68 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997)). Courts refer to the latter kind of legislation as "prophylactic," and, to be valid, such legislation must satisfy certain requirements designed to ensure that Congress has not substantively redefined the Fourteenth Amendment's guarantees. *Alaska*, 564 F.3d at 1067–68.

## 1. Title II is a congruent and proportional prophylactic response intended by Congress to curb constitutional violations by state actors.

Federal legislation intended to prophylactically address Fourteenth Amendment violations is valid provided it is "congruent and proportional to the harm that Congress sought to prevent." *Alaska*, 564 F.3d at 1068; *see also Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 360 (2001). To determine whether these requirements are met, courts "often examine legislative findings as part of that inquiry." *Alaska*, 564 F.3d at 1068; *see also Lane*, 541 U.S. at 523-34 (discussing legislative history pertaining to Title II).

This Court has held, repeatedly, that Congress validly abrogated state sovereign immunity under Title II for prophylactic purposes. *Phiffer*, 384 F.3d at

26

792 ("Our precedent clearly commands the conclusion that the [state] is not entitled to Eleventh Amendment immunity under Title II of the ADA."); *Lovell*, 303 F.3d at 1050 (citing *Clark*, 123 F.3d at 1270–71; *Dare v. California*, 191 F.3d 1167, 1173–75 (9th Cir. 1999)); *Hason v. Medical Board of California*, 279 F.3d 1167 (9th Cir. 2002); *Thomas v. Nakatani*, 309 F.3d 1203, 1209 (9th Cir. 2002). In doing so, this Court properly considered the appropriate legal standards and legislative history associated with Congress's enactment of Title II. *See Clark*, 123 F.3d at 1270; *Phiffer*, 384 F.3d at 792.[11] As such, all claims arising properly under Title II may be asserted against the states.

The Supreme Court has spoken only once on the topic of Title II abrogation since this Court last revisited this issue in *Phiffer*. In *U.S. v. Georgia*, the Supreme Court held unanimously that Title II validly abrogated sovereign immunity where the defendant had in fact violated the plaintiff's constitutional rights—a proposition that is hardly contentious. *Georgia*, 546 U.S. at 159. The decision did not, however, attempt to define "the outer limits" of prophylactic abrogation under

---

[11] In addition to this Court's reasoning set forth *Clark*, *Hason*, and *Lupert*, the State Bar, here, sits at the intersection of public education and access to the courts, two areas of law that courts have repeatedly held support the abrogation of sovereign immunity in the Title II context. *E.g., Lane*, 541 U.S. at 522-33 (access to the courts); *Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006) (public higher education); *Nat'l Ass'n of the Deaf v. State of Florida*, 980 F.3d 763, 772 (11th Cir. 2020).

Title II. *Id.* at 161 (Ginsburg, J., concurring). As such, *Georgia* cannot be read reasonably as undermining this Court's earlier abrogation decisions as to Title II. *See Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1171 (9th Cir. 2003) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court."). Thus, the district court's dismissal of Mr. Kohn's Title II claims on sovereign immunity grounds is of manifest error.

> **2. Abrogation is appropriate here even under the district court's flawed analysis because Mr. Kohn's claims give rise to violations of constitutionally protected rights.**

Even if Mr. Kohn's Title II claims must be predicated on an actual violation of his Fourteenth Amendment rights, the State Bar's conduct violated Mr. Kohn's rights to substantive due process, procedural due process, and equal protection. A threshold requirement for substantive and procedural due process claims is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972) and *Kraft v. Jacka*, 872 F.2d 862, 866 (9th Cir. 1989)).

A substantive due process claim requires a further showing that the deprivation of liberty or property interest transpired in such a way that it "shocks the conscience" or "interferes with the rights implicit in the concept of ordered

liberty," *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (citations omitted), while a procedural due process claim arises where the plaintiff was denied adequate procedural protections, *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). *See Daniels v. Williams*, 474 U.S. 327, 331 (1986).

Here, Mr. Kohn has a protected liberty and privacy interest in his corporeal self. *See Ingraham v. Wright*, 430 U.S. 651, 672 (1977); *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018) (recognizing a due process right to be free from state-created danger). State law further recognizes a due-process protected interest in claims for admission to the state bar. *Hallinan v. Comm. of Bar Examiners of State Bar*, 65 Cal. 2d 447, 452 n.3 (1966). As such, the State Bar's conduct in relation to bar applicants creates a considerable risk that it may deprive such persons of their rights by violating federal laws that ensure equal access to the California Bar Exam. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 570 (1974) (holding that due process protections apply to liberty and property interests created by state law). Accordingly, once the State Bar made its preliminary decision to permit Mr. Kohn to sit for the bar exam, it must thereafter have afforded him due process when

affecting or risking his physical well-being or his interests secured by state and federal laws.[12]

The State Bar did not do so. It violated Mr. Kohn's substantive due process rights by ignoring the medical recommendations of Mr. Kohn's physicians based upon general conclusions drawn by outside "experts" that have never met with Mr. Kohn. 2-ER-26–30, 33–37, 40-59, 295. Indeed, the State Bar conditioned Mr. Kohn's receipt of certain accommodations for the October 2020 exam on his taking the exam in person, unlike most others who took the exam remotely. *Id.* It did so despite Mr. Kohn's physician's explanations that Mr. Kohn is immuno-compromised and that the State Bar's decisions "put[] him at undue and high risk for irreparable medical harm." 2-ER-29.

The State Bar violated Mr. Kohn's procedural due process rights because its process for securing disability accommodations (1) is unreasonably burdensome and costly (requiring thousands of dollars spent on redundant medical evaluations); (2) requires excessive medical documentation in violation of 29 C.F.R. § 1630.2(k)(2); (3) overly scrutinizes non-substantive issues with the requests; (4) fails to fairly convey to the disabled applicant the State Bar's basis for denying

---

[12] The district court's reliance on *Giannini v. Real*, 911 F.2d 358 (9th Cir. 1990) is neither here, nor there. In *Giannini*, the plaintiff argued that his ability to practice law in one jurisdiction established a fundamental right in his ability to practice law in other jurisdictions. Mr. Kohn asserts no such right.

requested accommodations; and (5) is so lengthy as to deny applicants re-taking the exam a fair opportunity to obtain accommodations prior to the next exam cycle. 2-ER-281–84, 296–98.

The State Bar also violated Mr. Kohn's equal protection rights. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Serrano v. Francis*, 345 F.3d 1071, 1081 (9th Cir. 2003) (citations and quotations omitted). "Generally, legislation is presumed to pass constitutional muster and will be sustained if the classification drawn by the statute or ordinance is rationally related to a legitimate state interest." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–40 (1985) and *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982)). If the classification impinges a "fundamental right," however, the state action is subject to strict scrutiny. *Nunez by Nunez*, 114 F.3d at 944.

Here, as discussed above, Mr. Kohn has a fundamental liberty interest in his body and in being free from state-created danger. Accordingly, where the State Bar impinges on that interest by subjecting Mr. Kohn to different test conditions than that of similarly situated applicants, it must satisfy strict scrutiny. As relevant here, the State Bar invalidly conditioned Mr. Kohn's gaining equal access to the October

31

2020 bar exam on his sitting in-person for the exam. 2-ER-295. Meanwhile, the
vast majority of all other applicants were permitted to take the exam remotely to
mitigate concerns over the COVID-19 pandemic. *Id.*

The State Bar's disparate treatment of Mr. Kohn must therefore satisfy strict
scrutiny. It cannot do so within the confines of its motion to dismiss, nor did it
attempt to do so at the district court. 2-ER-60–94. The State Bar's administrative
concerns cannot, as a matter of law, be deemed sufficient justification for placing
immunocompromised individuals in harm's way. *See, e.g.*, *Santa Cruz Homeless
Union v. Bernal*, 514 F. Supp. 3d 1136, 1141 (N.D. Cal. 2021), *modified*, No. 20-
CV-09425-SVK, 2021 WL 1256888 (N.D. Cal. Apr. 1, 2021).

The district court's reliance on *Gordon v. State Bar of California*, No. 20-
CV-06442-LB, 2020 WL 5816580 (N.D. Cal. Sept. 30, 2020) is misplaced. *See*
Section IV(A)(1); 1-ER-14–15. First, the district court in *Gordon* addressed
whether preliminary injunctive relief was appropriate to prevent the State Bar from
requiring disabled applicants to take the October 2020 exam in person; it did not
address the issue of whether the plaintiffs stated a claim for relief for purposes of
Rule 12(b)(6). *Gordon*, 2020 WL 5816580 at *1. Second, the district court's
factual conclusions in *Gordon* cannot be validly considered on the State Bar's
motion to dismiss in Mr. Kohn's case, as the district court did here. 1-ER-14–15.
Third, the *Gordon* decision did not establish binding precedent and was wrongly

32

decided because the State Bar's remote testing conditions facially discriminate against, and disproportionately burden, disabled test takers. *Gordon*, 2020 WL 5816580 at \*6–8. Accordingly, this Court should reverse the district court's decision that the State Bar is immune from liability when it violates Title II.

## II. THE DISTRICT COURT ERRED BY DISMISSING MR. KOHN'S REHABILITATION ACT CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION.

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). On a motion to dismiss, "[a] Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also Int'l Union of Operating Eng'rs v. Cnty. of Plumas*, 559 F.3d 1041, 1043-44 (9th Cir. 2009). Where, as here, the defendant launches a factual attack on jurisdiction, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. *Safe Air for Everyone*, 373 F.3d at 1039. In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Id.* (citing *Savage*, 343 F.3d at 1039 n.1).

## A.    The Parties' Factual Dispute About Whether the State Bar Received Federal Funding Is Not a Jurisdictional Issue Capable of Resolution on a Motion to Dismiss.

The mere existence of a factual dispute between parties does not always implicate a district court's subject matter jurisdiction. *Safe Air for Everyone*, 373 F.3d at 1039. In cases premised on federal question jurisdiction, dismissal under Rule 12(b)(1) for lack of subjection matter jurisdiction is improper unless "the alleged claim under the constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-83 (1946); *see also Sun Valley Gas.*, 711 F.2d at 140.

Dismissal under Rule 12(b)(1) is also inappropriate where "the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *Sun Valley*, 711 F.2d at 139 (quotations omitted). This occurs where "a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Safe Air for Everyone*, 373 F.3d at 1039 (quotations omitted); *see also Thornhill Publ'g Co. v. Gen. Tel. Co.*, 594 F.2d 730, 734 (9th Cir. 1979).

Here, the district court erred by dismissing Mr. Kohn's Section 504 claims for two reasons. First, the record provides no reasonable basis on which it may be

34

inferred that Mr. Kohn pled his claims for improper purposes, nor has the State Bar argued as much. 2-ER-89. Second, the "jurisdictional" issue of whether the State Bar received federal funding is necessarily intertwined with, and is in fact the same as, a substantive element of Mr. Kohn's Section 504 claims. *See* 1-ER-16 ("While plaintiff alleges defendants receive federal funding, defendants have controverted these allegations with a declaration and evidence . . . ."); *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017) (reciting elements for a Section 504 claim). Accordingly, the district court cannot, on a motion to dismiss, resolve a factual dispute between the parties for the purpose of dismissing Mr. Kohn's claims with prejudice.

### B. The District Court Further Erred by Failing to Consider Whether Federal Assistance Was Extended to the State Bar Through Indirect Means and by Failing to Allow Jurisdictional Discovery.

Setting aside the limitations on jurisdictional fact-finding discussed above, the evidence the State Bar supplied to the district court—even if it is assumed to be true—does not actually preclude the State Bar from being held liable under the Section 504. The State Bar's Chief Financial Officer generally disavows the State Bar's receipt of federal funding "to the best of [his] knowledge." 2-ER-97. It does not, however, flatly or comprehensively deny that the State of California or one of its instrumentalities has extended indirectly federal financial assistance to the State Bar. *See* 29 U.S.C. § 794(b)(1)(B) (defining a "program or activity" subject to

35

Section 504 as including state operations "to which the assistance is extended"); 45 C.F.R. § 84.3(f).

Indirect receipt of federal funds is widely acknowledged as sufficient to subject an entity to liability under the Rehabilitation Act. *See Arbogast v. Kansas*, 789 F.3d 1174, 1183 (10th Cir. 2015); *McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'r*, 650 F.App'x 703, 706 (11th Cir. 2016); *Thomlison v. City of Omaha*, 63 F.3d 786, 789 (8th Cir. 1995); *Maloney v. SSA*, 517 F.3d 70, 75 (2nd Cir. 2008); *T.W. v. New York State Board of Law Examiners*, 996 F.3d 87, 92 (2d Cir. 2021). The inapposite cases relied on by the district court to not hold otherwise. 1-ER-19 (citing *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986); *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908–09 (9th Cir. 2013)). Accordingly, the State Bar's evidence fails to refute the existence of federal question jurisdiction.

Of course, the district court's decision to accept as true the contents of the State Bar's self-serving declaration is itself of significant concern. *See Nat'l Ass'n of the Deaf*, 980 F.3d at 775 (affirming district court's denial of motion to dismiss under Rule 12(b)(1) based on a "self-serving" affidavit denying receipt of federal funding); *Sun Valley Gas., Inc.*, 711 F.2d at 139 (noting that "jurisdictional fact-finding by the court deprives litigants of the protections otherwise afforded by Rule 56"). At a minimum, the district court should have provided Mr. Kohn with

36

an opportunity to engage in jurisdictional discovery as to the issue of federal

funding. Accordingly, this Court should reverse this district court's dismissal of

Mr. Kohn's Section 504 claims.

### III. MR. KOHN'S FIRST AMENDED COMPLAINT PLEADS FACTS SUFFICIENT TO STATE A CLAIM FOR RELIEF.

The FAC demonstrates that Mr. Kohn sufficiently pled claims under Title II,

Section 504, and the Unruh Act.[13] So long as a court can reasonably infer from the

allegations that a defendant is liable for the misconduct alleged, a claim is

plausibly pled. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint should

not be dismissed unless it is "beyond doubt" that the plaintiff has not stated facts

supporting alleged claims *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th

Cir. 2004) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Swierkiewicz v.*

*Sorema N.A.*, 534 U.S. 506, 512 (2002) (recognizing that in discrimination cases, a

pristine prima facie case may require discovery to unearth particular facts).

### A. Mr. Kohn Plausibly Stated a Claim Under Title II of the Americans with Disabilities Act.

To state a claim under Title II, a plaintiff must plead facts demonstrating that

he is (1) a qualified individual with a disability; (2) was excluded from

---

[13] The district court did not reach all arguments raised by the State Bar in its order
granting the motion to dismiss under Rule 12(b)(6). 1-ER-3–19; 2-ER-60–94.
Nevertheless, as discussed below, there is no valid basis for the district court's
dismissal with prejudice and without leave to amend.

participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of his disability. *See* 42 U.S.C. § 12132; *Lovell*, 303 F.3d at 1052. "A public entity may violate the ADA even if no regulation expressly proscribes its particular conduct." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014). Indeed, Title II utilizes "broad language" that brings "anything a public entity does" within its scope. *Id.* The State Bar did not challenge below that Mr. Kohn adequately alleged he is a qualified disabled individual, nor can it do so reasonably. 2-ER-78–79. Further, the second and third elements are also sufficiently pled to state a claim under Title II.

The second and third elements are satisfied where the defendant's policies or conduct are facially discriminatory or discriminatory in practice. A facially discriminatory law and/or policy per se violates Title II. *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999). Alternatively, a facially neutral law and/or policy violates Title II if it creates a disparate impact among those with disabilities or if it fails to provide reasonable accommodations to an individual with a disability. *Payan v. L.A. Cmty. College Dist.*, 11 F.4th 729, 738 (9th Cir. 2021).

Here, the State Bar's "Timing and Procedure Policies" and "Emergency Policies" violate Title II under one or more of the three theories of liability

38

discussed below, entitling Mr. Kohn to monetary damages. *See Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (2001).

### 1. The State Bar's October 2020 "Forced In-Person Policy" is facially discriminatory.

A law and/or policy is facially discriminatory against the disabled if the law sufficiently targets persons by referencing their disabilities. *See Bay Area Addiction Research & Treatment, Inc.*, 179 F.3d at 737 (recognizing that an ordinance prohibiting "methadone clinics" within 500 feet of residential areas sufficiently targeted persons of disability that used methadone clinics and thus was facially discriminatory against the disabled).

The State Bar's Forced In-Person Policy for the October 2020 exam explicitly targeted disabled individuals and thus per se violates Title II. Per the FAC, the Forced In-Person Policy applied to "applicants *with disabilities*." 2-ER-295:10-13 (emphasis added). As pled, this policy explicitly targets those with disabilities and—worse still—subjects them to in-person testing at the State Bar's whim during a time when in-person events were extremely dangerous and likely fatal for those with disabilities, who are often immunocompromised like Mr. Kohn.

*See* 2-ER-26. This policy facially discriminates against those with disabilities and per se violates Title II.[14]

>   **2.     A court can reasonably infer the State Bar's "Timing and Procedure Policies" and "Emergency Policies" cause a disparate impact.**

Even if this Court considers the above "Forced In-Person Policy" to be facially neutral, the FAC alleges sufficient facts from which a court can reasonably infer the State Bar's review accommodation policies separately and collectively violate Title II by disparately impacting those with disabilities. To make a prima facie case of disparate impact, the complaint must allege (1) a facially neutral law and/or policy that (2) has the "effect of denying meaningful access to public services to people with disabilities." *Payan*, 11 F.4th at 738. A policy denies equal access if the policy unduly burdens persons with disabilities, even when such policies are consistently enforced. *McGary*, 386 F.3d at 1265.

If this Court considers the Forced In-Person Policy to be neutral, undoubtedly the State Bar's Timing and Procedure Policies and Emergency

---

[14] The policy also violates the ADA by providing those with disabilities less safe alternative testing conditions (such as a remote option) than those without disabilities. *See Cal. School for the Blind v. Honig*, 736 F.2d 538, 547 (9th Cir. 1984), *vacated on other grounds*, 471 U.S. 148 (1985) (recognizing that providing disabled students with facilities less safe than those provided to other students discriminates against those with disabilities); *Putnam v. Oakland Unified Sch. Dist.*, No. C-93-3772CW, 1995 WL 873734, at *1 (N.D. Cal. June 9, 1995) (same).

Deadline Policy are neutral as well. Those policies apply to individuals requesting

accommodations regardless of the reason for the accommodation, be it for

disability, religious practices, or other reason. Thus, the policies satisfy the first

element.

A court can also reasonably infer that these policies unduly burden persons

with disabilities. The Department of Justice ("DOJ") has published rules regarding

how testing accommodations should be reviewed and approved to avoid unduly

burdening those with disabilities. 2-ER-296, ¶32. The DOJ rules state that testing

entities "must" offer examinations to those with disabilities in a "timely" manner

that allows them to timely register and prepare for tests. *Id.* The rules further

prohibit "impos[ing] earlier registration deadlines" on those seeking

accommodations. *Id.* Further, requests that result in extended delay and seeking

unnecessary documentation could "constitute[] a denial of equal opportunity." *Id.*

These rules are entitled to *Auer* deference, and thus a court can reasonably infer the

State Bar's policies/procedures unduly burden those with disabilities by failing to

produce the above results. *See Kisor*, 139 S. Ct. 2400, 2416 (2019) (discussing the

situations when *Auer* deference applies).

The State Bar's processing time of two to six months effectively imposes an

earlier registration deadline on those with disabilities in violation of DOJ rules. At

minimum, an individual with disabilities would need to apply six months prior to

the registration deadline to know if their accommodation requests will be granted prior to incurring the hefty registration fee. This lengthy timeframe means requested accommodations may likely become outdated or insufficient by the time they are granted since several disability accommodations are based on physical, mental, and/or neurological needs that evolve with time and ongoing medical treatment. *See* 3-ER-354 (describing the constant evolution of Mr. Kohn's own disabilities). Such results should not be tolerated and undoubtably burden those with disabilities from obtaining the reasonable accommodations needed for an equal footing.

Similarly, the lack of a concrete timeline in the State Bar's Timing and Procedure Policies unduly burdens those with disabilities by forcing them to stomach the risk of registering for and incurring costly exam preparatory expenses before knowing if their accommodation requests were approved. *Compare e.g.*, 2-ER-293 (As of July 2020, Mr. Kohn was registered for the October 2020 exam) *with* 2-ER-315—316 (August 2020 denial [and mischaracterization] of Mr. Kohn's reasonable accommodation requests for the October 2020 exam). This vague timeline was especially trying during the pandemic, when the format of the bar exam was constantly in flux, which in turn altered the types of accommodation requests to be made by those with disabilities. *Compare* 2-ER-50 (at-home accommodation requests) *with* 2-ER-43 (describing in-person accommodation

42

requests). Having to shift accommodation requests amidst an already vague and lengthy review timeline placed an extraordinary burden on those with disabilities who were already facing scarce availability for in-person medical appointments and physician availability. *See* 2-ER-297:8-21.

Likewise, the State Bar's failure to disclose or adopt a uniform process for deciding whether an accommodation is appropriate or not, and its failure to provide detailed explanations for its denials of requested accommodations causes unacceptable results, including (but not limited to):

(1) Applicants not knowing how much or what kind of medical evidence is sufficient to support a request before the State Bar's initial review or appeal (*see e.g.*, 2-ER-283:17-18 [justifying denial ". . . because [Mr. Kohn's experts] had not foreseen and volunteered every minor piece of information [the State Bar's expert] have liked to consider . . ."]);

(2) The State Bar failing to accurately review accommodation requests, as evidenced by the mischaracterized and misinterpreted summarizes of the requests in its denial letters to Mr. Kohn (*see, e.g.*, 5-ER-1149, n.18);

(3) The State Bar's medical experts applying incorrect legal standards when evaluating accommodation requests (*see* 2-ER-283:13-20 [denying requests because ". . . Mr. Kohn and his experts haven't proved [the requests] are absolutely necessary"]);

43

(4) The State Bar making excessive and unnecessary demands for medical documentation, but then sending only "cherry-picked documents" to their expert (2-ER-303:24-25); and

(5) Applicants being denied any interactive or collaborative review process to respond to the reviewing committee's substantive concerns prior to the strict time restraints of the appeal process and its vague explanations (*see* 2-ER-284; 3-ER-346).

Such results unduly burden those with disabilities who often need to provide medical evidence to validate their requests, and which medical evidence can be difficult and financially expensive to obtain especially during a pandemic. For these reasons, such results are already prohibited by numerous ADA regulations for their burdensome effect and are equally prohibited here. *See, e.g.*, 28 C.F.R. § 36.309(b)(iv) (prohibiting excessive documentation requests).

Lastly, the State Bar's "Emergency Policies" during the pandemic also unduly burdened those with disabilities. The Forced In-Person Policy unacceptably risked the lives of those with disabilities while those without disabilities took the exams in the safety of their homes. The Emergency Deadline Policy—coupled with the State Bar's already lengthy review process—effectively denied applicants the opportunity to appeal any denials they needed to adjust to the evolving formats of the bar exam. 2-ER-295. A court can reasonably infer undue burden from these

44

pled facts (and the facts in the record below) and thus the FAC sufficiently

establishes a prima facie disparate impact claim.

### 3. The State Bar Failed to Reasonably Accommodate Mr. Kohn's Disabilities.

The State Bar also violated Title II by failing to provide Mr. Kohn with

reasonable accommodations. In general, a public entity must provide those with

disabilities reasonable accommodations. 29 C.F.R. § 35.130(b)(7). To determine if

an accommodation is reasonable "requires a fact-specific, individualized analysis"

of the plaintiff's circumstances and what might allow the plaintiff to meet the

program's standards. *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir.

1999). For entities administering licensing exams, accommodations are

unreasonable if they fail to "best ensure" a level playing field with individuals

without disabilities. *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153,

1163 (9th Cir. 2011) (discussing Title III "reasonable accommodation" testing

standard); *see also* 28 C.F.R. Pt. 35, App. A (approving the application of Title III

testing standards to Title II testing situations").[15] Ensuring reasonable

accommodations includes deferring to "[r]eports from experts who have personal

---

[15] *See* Addendum, page 46; *see also K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013) (noting that a public entity can only reject a reasonable accommodation request if it demonstrates undue burden or fundamental alteration).

familiarity with the candidate" over "reviewers for testing agencies, who have never personally met the candidate . . . ." 28 C.F.R. Pt. 36, App. A.[16]

Accordingly, at the pleading stage, a plaintiff need only allege facts that (1) defendants have a legal duty to provide accommodations, (2) plaintiff requested specific accommodations based on individualized needs, and (3) if accommodations are provided, that plaintiff reviewed them and deemed them inadequate.[17] *See Duvall*, 260 F.3d at 1138 (recognizing a material issue of fact as to reasonableness existed when the plaintiff examined the accommodations the defendant offered, rejected them, and provided evidence that the provided accommodations were insufficient for his needs). Here, the FAC alleges sufficient facts to demonstrate that the State Bar failed to reasonably accommodate Mr. Kohn for the February 2019, February 2020, and October 2020 exams.

First, the State Bar is a public entity and thus has the legal duty to provide reasonable accommodations. Cal. Bus. & Prof. Code § 6001. Second, the FAC

---

[16] *See* Addendum, page 52.

[17] The State Bar, in its motion to dismiss, inappropriately conflated the burden of proof standards discussed in *Duvall* with the pleading standards under Rule 8 in arguing that Mr. Kohn's FAC was deficient because it lacked the legal conclusions that the State Bar's accommodations were "unreasonable." *See* 2-ER-87. In reviewing the sufficiency of a complaint, the issue is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to support his claims. *McGary*, 386 F.3d at 1261.

asserts Mr. Kohn requested several specific accommodations based on his treating physicians' recommendations for each bar exam. *See* 2-ER-290—293:22. Lastly, for the February 2019 and February 2020 exams, Mr. Kohn reviewed the offered accommodations and appealed them after determining that the accommodations were insufficient for his particular needs. 2-ER-299:27—300:5. The record below also contains facts that Mr. Kohn challenged the sufficiency of the accommodations granted for October 2020 exam based on his immunodeficiencies and other conditions. *See* 2-ER-26—30; 2-ER-33—37. These facts, when taken as true, sufficiently establish a prima facie case that the State Bar failed to reasonably accommodate Mr. Kohn's disabilities.

### 4. Mr. Kohn sufficiently pleaded facts of deliberate indifference to obtain monetary damages under the ADA.

A plaintiff may seek damages under Title II if defendants acted with deliberate indifference. *Duvall*, 260 F.3d at 1139. Deliberate indifference requires (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. *Id.* The FAC is replete with allegations that satisfy both these elements.

First, the State Bar had knowledge of harm to a federally protected right. A plaintiff satisfies the first element by alerting the public entity about the plaintiff's need for accommodation. *Duvall*, 260 F.3d at 1139. Mr. Kohn alerted the State Bar as to his needs for accommodation by petitioning the State Bar for accommodation

47

based on his disabilities prior to each bar exam, satisfying the first element. *See e.g.*, 2-ER-298:15-16.

Second, while a breach of any one of the above duties is sufficient to satisfy this element, the FAC alleges facts demonstrating the State Bar's breach of each duty listed above. The State Bar failed to undertake a fact-specific investigation of Mr. Kohn's situation by, *inter alia*, inaccurately reviewing and mischaracterizing the medical evidence Mr. Kohn offered (2-ER-282:12-14); by having "poor comprehension of background facts" suggesting that the State Bar had failed to read the entire file Mr. Kohn provided with his petition (2-ER-282:15-19); and by reviewing only "new documents" on subsequent exam petitions for accommodations instead of the entire submitted file. 2-ER-300:5-7. A court can more than reasonably infer from these facts that the State Bar deliberately failed to undertake a fact-specific investigation.

A court can also reasonably infer that the State Bar merely speculated that a suggested accommodation was not feasible. The State Bar repeatedly provided little to no medical or other explanation for why certain accommodations were denied, only summarily stating that the documentation did not support the requests. *See e.g.*, 2-ER-284:14–15. The State Bar also denied having "any duty to provide a detailed explanation." 2-ER-284:16–17. These facts reasonably infer that the State Bar merely speculated in denying certain requests during some exams, especially

48

when the State Bar failed to have any expert review Mr. Kohn's requests before denying many of them. *See* 2-ER-303:13-14.

The State Bar also failed to consult adequate experts as needed to determine what accommodations are necessary. *Cf.* 28 C.F.R. Pt. 36, App. A (requiring testing agencies to give precedence to treating physician opinions over reviewers who do not understand the full complexities of an individual's disability).[18] For all three bar exams at issue, the State Bar failed to consult sufficient physicians and ignored Mr. Kohn's expert evidence. *See e.g.*, 2-ER-298:1-3. These repeated instances coupled with the State Bar's rejection of Mr. Kohn's treating physician recommendations undoubtedly establish the State Bar's breach of its duty to consult adequate experts.

Lastly, and perhaps most perniciously, the State Bar seemingly intentionally delayed reviewing Mr. Kohn's accommodation requests for the October 2020 exam to prevent him from filing a timely appeal. 2-ER-294:19-23. Needless to say, the myriad of breaches by the State Bar pled throughout the FAC adequately allege that the State Bar acted with deliberate indifference.

---

[18] *See* Addendum, page 52.

49

**B.    Mr. Kohn Plausibly Pled Claims under Section 504 of the Rehabilitation Act.**

"The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance . . . ." *Armstrong v. Davis*, 275 F.3d 849, 862 n. 17 (9th Cir. 2001) (internal quotations omitted), abrogated on other grounds by *Johnson v. California*, 543 U.S. 499, 504–05 (2005); *see also Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 999 (9th Cir. 2013). Because Mr. Kohn validly states his claims under Title II of the ADA, he has also stated claims under Section 504 of the Rehabilitation Act. 1-ER-18 (holding that Mr. Kohn plausibly pled the State Bar received federal funding).

**C.    Mr. Kohn Plausibly Pled Claims under the California Unruh Act.**

The district court erred in dismissing with prejudice and without leave to amend Mr. Kohn's Unruh Act claims for two reasons. First, the district court based its ruling on the incorrect premise that the State Bar is immune from Title II of the ADA.[19] Second, the district court incorrectly held that the language of California Civil Code Section 51(b) limited the scope of California Civil Code Section 51(f).

---

[19] To the extent the district court held sovereign immunity applies to the Unruh Act, the district court also erred because the California legislature explicitly incorporated the ADA into the Unruh Act and thus consented to waive sovereign

50

As discussed above in Sections I and III(A), the State Bar is not immune from Title II of the ADA and Mr. Kohn has plausibly pled facts establishing Title II violations. Furthermore, Section 51(f) is not limited to "business establishments," and even if it were, California case law, the plain language, and legislative history of the Unruh Act subjects the State Bar to its purview as a matter of law. Accordingly, Mr. Kohn has sufficiently pled a prima facie violation of the Unruh Act pursuant to Section 51(f).

**1.    Subsection (b) of the Unruh Act does not limit the scope of subsection (f).**

Subsection (b) of the Unruh Act does not limit the scope of subsection (f).

The relevant parts of the Unruh Act provide:

> (b) All persons . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

> (f) A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section.

Cal. Civ. Code § 51(b), (f).

---

immunity for such claims." *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) ("A State may waive its sovereign immunity by making a clear declaration that it intends to submit itself to federal court jurisdiction") (internal quotations omitted).

While California jurisprudence has not directly addressed if and to what extent the phrase "all business establishments of every kind" in subsection (b) limits or modifies (if at all) subsection (f), the California Supreme Court has interpreted the two subsections concurrently, holding that subsection (f) in fact *broadened* the Unruh Act beyond subsection (b) to encompass additional protections against discrimination. *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 671-72 (2009).[20]

In *Munson*, the California Supreme Court addressed whether a plaintiff had to prove intentional discrimination—an element required by subsection (b)—to recover under subsection (f). 46 Cal. 4th at 670. In holding no, the California Supreme Court fully condoned the Ninth Circuit's interpretation of the plain language of subsection (f) as adopting the "full expanse" of the ADA, prohibiting both intentional and unintentional forms of discrimination. *Id.* at 665 (citing *Lentini v. California Center for the Arts*, 370 F.3d 837 (9th Cir. 2004) (holding that a violation of the ADA constituted a per se violation of the Unruh Act)). Furthermore, the court described subsection (f) as *expanding* the Unruh Act

---

[20] *But see Brennon B. v. Superior Court*, 57 Cal. App. 5th 367, 398 (2020) (review granted Feb. 24, 2021, S266254) (interpreting subsection (f) to be ambiguous for public schools). However, per California Rules of Court 8.1115(e), this case holds no binding or precedential effect while review is pending before the California Supreme Court.

beyond the scope of subsection (b) to include a "category of discrimination" not yet included in subsection (b)." *Id.* (internal quotations omitted). This reasoning was supported by the fact that subsection (f) made no distinction between intentional and unintentional violations of the ADA. *Id.* at 672-73. Additionally, legislative history also reflected an intent that subsection (f) would "[m]ake a violation of the ADA a violation of the Unruh Act." *Id.* at 670 (quoting from legislative reports) (internal quotations omitted).

The California Supreme Court's explanation in *Munson* of the interaction between subsection (b) and (f) fully applies here. Just as subsection (f) was not limited to subsection (b)'s intentional discrimination, so too is subsection (f) not bound by subsection (b)'s business establishments. This is evidenced by the facts that subsection (f) makes no distinction between the types of entities held liable under the ADA and legislative notes that similarly indicate no intention of limiting the scope of ADA violations under the Unruh Act. Accordingly, because Mr. Kohn has validly pled that the State Bar violated Title II, he has also stated a claim under subsection (f) of the Unruh Act.[21]

---

[21] Liability under Section 51(f) also extends to the individual agents of the State Bar and Committee of the State Bar individual agents. *See* Cal. Civ. Code § 52(a) ("*Whoever* denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 . . . is liable . . . .") (emphasis added); *K.S. v.*

## 2. The State Bar engages in businesslike activities and therefore is a "business establishment" under the Unruh Act.

Even if this Court limits subsection (f) to just "business establishments," the State Bar functions as a business establishment for purposes of reviewing accommodation requests and administering the bar exam. Although "business establishment" is not defined under the Unruh Act, the California Supreme Court has repeatedly noted that the text of the statute—especially the phrases "in all" and "of every kind whatsoever"—and legislative intent demonstrate that "business establishments" was used in the "broadest sense possible." *O'Connor v. Village Green Owners Assn*., 33 Cal. 3d 790, 795 (1983).

In determining legislative intent, the California Supreme Court has repeatedly looked to *prior* drafts of the Unruh bill for groups or organizations listed in those drafts (though deleted from the final bill) to decipher the scope of "business establishment." *See, e.g.*, *Isbister v. Boys' Club of Santa Cruz*, 40 Cal. 3d 72, 79 (1985) (holding that a nonprofit was subject to Unruh after establishing it was "a place of public accommodation or amusement," under Unruh's predecessor statute); *O'Connor*, 33 Cal. 3d at 795 (holding that a not-for-profit owner

---

*Fremont Unified Sch. Dist.*, No. C 06-07218 SI, 2007 WL 4287522, at *5 (N.D. Cal. Dec. 6, 2007) (noting that plain language indicates liability under the Unruh Act is not premised upon a showing that defendant is a "business establishment").

association was a "business establishment" after noting "organization" was listed in prior versions of the Unruh Act).

The California Supreme Court explained that although specific groups referenced in prior drafts of the bill were deleted from the final bill, the deletion was because the Legislature already considered such groups to be encompassed in the broad language of the bill, thus rendering the specific references to be "mere surplusage." *Burks v. Poppy Const. Co.*, 57 Cal. 2d 463, 469 (1962). Accordingly, so long as the group/organization was listed in prior versions of the Unruh Act and has "businesslike attributes," they fell under the statute's purview. *O'Connor*, 33 Cal. 3d at 796.

To determine what constitutes "businesslike attributes" courts look at the general operations of the group/organization. *O'Connor* at 796. Specifically, a group/organization has businesslike attributes if it employs others, establishes and collects assessment fees from members, and adopts and enforces rules and regulations for the common good. *Id.* at 796 (holding these activities along with the inclusion of "organizations" in prior versions of the bill subjected a non-profit association to the Unruh Act); *see also Warfield v. Peninsula Golf & Country Club*, 10 Cal. 4th 594, 621 (1995) (holding that a defendant's membership process was subject to Unruh because membership fees provided income for the club and nonmembers could access the club's facilities for a fee).

55

Here, the State Bar has these same businesslike attributes. It has employees, collects millions of dollars in dues from its members, and adopts and enforces rules for the purported common good. 2-ER-99–245. Moreover, when the California Legislature considered earlier versions of the eventually enacted Unruh Act, those versions included language expressly encompassing "any and all business or professional organizations formed or maintained by licensees of the State of California;" and "any professional person, group or association licensed or certified by the State of California . . . ," which clearly encompass the State Bar.[22] Accordingly, the State Bar is subject to the Unruh Act.

The district court erred in holding that government entities are, per se, exempt from complying with the Unruh Act. 1-ER-17 (citing *Harrison v. Rancho Mirage*, 243 Cal. App. 4th 162, 175 (2015)). The holding in *Harrison* was limited to *legislative actions* not being subject to the Unruh Act. 243 Cal. App. 4th at 175 ("[W]e see no room for its application to the city's *legislative action* here"). The court did not extend its holding so broadly to include *all* city actions, nor all government entities. *Id.*

---

[22] *See* Horowitz, The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application (1960) 33 So.Cal. L.Rev. 260, 268 & n. 35 (*Horowitz*); *Warfield v. Peninsula Golf & Country Club*, 10 Cal. 4th 594, 608 n.8 (1995) ("The complete progression of the [Unruh] bill . . . is set forth in detail in [*Horowitz*]").

Indeed, such a broad interpretation is contradicted by at least two California Supreme Court opinions. *See Stoumen v. Reilly*, 37 Cal. 2d 713, 234 (1951) (holding that the state liquor board was subject to the Unruh Act); *Orloff v. Los Angeles Turf Club*, 36 Cal. 2d 734, 737–38 (1951) (holding that the California Horse Racing Board was subject to the Unruh Act); *see also Gatto v. Cnty. of Sonoma*, 98 Cal. App. 4th 744, 768 (2002) (analyzing whether a county-fair dress code violated Unruh); *Yates v. East Side Union High Sch. Dist*., No. 18-CV-02966-JD, 2019 WL 721313 (N.D. Cal. Feb. 20, 2019) (collecting district court cases applying Unruh Act to public schools); *Gibson v. Cnty. of Riverside*, 181 F. Supp. 2d 1057, 1090 (C.D. Cal. 2002) (recognizing California Supreme Court precedence condoned application of Unruh Act to public entities). Thus, this Court should reject the district court's interpretation of the holding in *Harrison*.

### 3. The State Bar's action of administering the bar exam, including its accommodation-request review process, is subject to the Unruh Act.

Even if this Court does not consider the State Bar, as a whole, to be a business establishment, the State Bar must nevertheless comply with the Unruh Act when reviewing Mr. Kohn's accommodation requests because such actions are part of its business transaction of administering the bar. Indeed, non-businesslike entities still qualify as "business establishments" when they are engaged in businesslike *actions*. *Warfield*, 10 Cal. 4th at 619.

For instance, in *Warfield*, plaintiffs sued a private club for violating the Unruh Act because the club excluded women from proprietary membership. *Id.* at 598. The California Supreme Court held that although the Unruh Act did not apply to private clubs as a general matter, it did apply to the club when it engaged in regular "business transactions." *Id.* at 618. Thus, the Court held that the private club's membership services were subject to the Unruh Act because it generated income on a regular basis for the club, it involved interacting with members of the public, and nonmembers could still access certain parts of its facilities by paying a non-membership fee. *Id.* at 621-23. As such, that action of the club's was still subject to the Unruh Act. *Id.* at 621.

Here, the State Bar's action of administering the bar exam—which includes its handling of accommodation requests—constitutes a regular business transaction that falls under the purview of the Unruh Act. Similar to the membership fees in *Warfield*, the State Bar obtains regular income through its examination fees. *See, e.g.*, 2-ER-204 (Exam fees). The State Bar also necessarily interacts with non-members of the public seeking admission to the California bar. *See* Cal. Bus. & Prof. Code § 6060. These non-members must access the testing facilities secured by the State Bar to sit for the bar exam. *See* 2-ER-287:9-10. Accordingly, the State Bar must comply with the Unruh Act when administering the California Bar Exam.

58

4.   **The California Government Claims Act does not bar Mr. Kohn's Unruh Act claims.**

The California Government Claims Act requires a plaintiff to provide written notice of state claims against a public entity prior to asserting those claims against that entity in court. Cal. Gov. Code § 945.4. Here, the FAC sufficiently alleges compliance with this requirement, and the State Bar's argument otherwise to the district court rings hollow. 2-ER-280–81, 310–12; *see also Phillips v. Desert Hosp. Dist.*, 49 Cal. 3d 699, 705 (1989) (recognizing that "substantial compliance" with the claims filing requirement suffices); *Perez v. Golden Empire Transit Dist.*, 209 Cal. App. 4th 1228, 1236 (2012). Any technical defects could be remedied by filing an amended complaint.[23]

## IV.   THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING LEAVE TO AMEND.

"A district court's exercise of discretion based on an erroneous interpretation of the law constitutes an abuse of discretion." *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009). "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).

---

[23] The State Bar rejected Mr. Kohn's claims for damages after he filed his FAC.

As discussed above in Section I, the district court erroneously applied the doctrine of sovereign immunity to this case. Furthermore, as explained in Section III, the amended complaint sufficiently pleads facts supporting violations under Title II, Section 504, and the Unruh Act. To the extent there is doubt as to whether the FAC sufficiently pleads prima facie claims, the record is replete with facts that can resolve those doubts (especially from the motions for preliminary injunction) and thus leave for amendment should be granted to allow those additions.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Court (1) vacate the Judgment of the district court, (2) reverse the district court's orders dismissing Mr. Kohn's claims with prejudice, and (3) remand to the district court with instructions to permit Mr. Kohn leave to file an amended complaint.

Date: April 8, 2022,                              Respectfully submitted,

*/s/ Gregory R. Michael*
Gregory R. Michael (SBN: 306814)
Dorothy C. Yamamoto (SBN: 306817)
MICHAEL YAMAMOTO LLP
1400 Shattuck Ave., #412
Berkeley, CA 94709
Phone: 510.296.5600
Fax: 510.296.5600

Attorneys for Plaintiff and Appellant
Benjamin Kohn

60

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, I certify that I am not aware of any related cases pending in this Court.

Date: April 8, 2022,

/s/ Gregory R. Michael

Gregory R. Michael

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Replacement Opening Brief complies with the requirements of Fed. R. App. P. 32(a) as modified by Circuit Rule 32-1. The brief was prepared in Times New Roman 14-point font, and contains 13,844 words, as counted by Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Date: April 8, 2022,

*/s/ Gregory R. Michael*
Gregory R. Michael

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2022, I filed the foregoing Appellant's Replacement Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: April 8, 2022,

*/s/ Gregory R. Michael*
Gregory R. Michael

**ADDENDUM**

## Constitutional Provisions

U.S. Const. Amdt. 11.................................................................Add–3

U.S. Const. Amdt. 14.................................................................Add–4

## Federal Statutes

29 U.S.C. § 794.......................................................................Add–6

42 U.S.C. § 12131...................................................................Add–8

42 U.S.C. § 12132...................................................................Add–9

42 U.S.C. § 2000d–7...............................................................Add–10

## State Statutes

Cal. Bus. & Prof. Code § 6001. ...............................................Add–11

Cal. Bus. & Prof. Code § 6008. ...............................................Add–13

Cal. Bus. & Prof. Code § 6008.1. ............................................Add–14

Cal. Bus. & Prof. Code § 6008.2. ............................................Add–15

Cal. Bus. & Prof. Code § 6063. ...............................................Add–16

Cal. Bus. & Prof. Code § 6140. ...............................................Add–17

Cal. Civ. Code § 51..................................................................Add–18

Cal. Civ. Code § 52..................................................................Add–22

Cal. Gov. Code § 945.4............................................................Add–24

Cal. Gov. Code § 11135............................................................Add–25

Cal. Gov. Code § 12944............................................................Add–27

**California Rules**

Cal. Rules of Ct., rule 9.13. ........................................................Add–29

Cal. State Bar Rules, rule 4.2....................................................Add–32

**Regulations**

28 C.F.R. § 35.130. ....................................................................Add–33

28 C.F.R. § 36.309. ....................................................................Add–37

28 C.F.R. Pt. 35, App. A (excerpt). ..........................................Add–40

28 C.F.R. Pt. 36, App. A (excerpt). ..........................................Add–47

29 C.F.R. § 1630.2. ....................................................................Add–56

45 C.F.R. § 84.3. ........................................................................Add–66

Case: 20-17316, 04/08/2022, ID: 12416678, DktEntry: 36, Page 80 of 146

**Amendment XI. Suits Against States, USCA CONST Amend. XI**

United States Code Annotated
    Constitution of the United States
        Annotated
            Amendment XI. Suits Against States

U.S.C.A. Const. Amend. XI

Amendment XI. Suits Against States

Currentness

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Notes of Decisions (5777)

U.S.C.A. Const. Amend. XI, USCA CONST Amend. XI
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

**End of Document**                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    1

United States Code Annotated
 Constitution of the United States
  Annotated
   Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection;
   Apportionment of Representation; Disqualification of Officers; Public Debt; Enforcement

U.S.C.A. Const. Amend. XIV

# AMENDMENT XIV. CITIZENSHIP; PRIVILEGES AND IMMUNITIES; DUE PROCESS; EQUAL PROTECTION; APPOINTMENT OF REPRESENTATION; DISQUALIFICATION OF OFFICERS; PUBLIC DEBT; ENFORCEMENT

Currentness

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

<Section 1 of this amendment is further displayed in separate documents according to subject matter,>

<see USCA Const Amend. XIV, § 1-Citizens>

Add-4

<see USCA Const Amend. XIV, § 1-Privileges>

<see USCA Const Amend. XIV, § 1-Due Proc>

<see USCA Const Amend. XIV, § 1-Equal Protect>

<sections 2 to 5 of this amendment are displayed as separate documents,>

<see USCA Const Amend. XIV, § 2,>

<see USCA Const Amend. XIV, § 3,>

<see USCA Const Amend. XIV, § 4,>

<see USCA Const Amend. XIV, § 5,>

U.S.C.A. Const. Amend. XIV, USCA CONST Amend. XIV
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                    2

United States Code Annotated
   Title 29. Labor
      Chapter 16. Vocational Rehabilitation and Other Rehabilitation Services (Refs & Annos)
         Subchapter V. Rights and Advocacy (Refs & Annos)

29 U.S.C.A. § 794

## § 794. Nondiscrimination under Federal grants and programs

Effective: October 1, 2016
Currentness

**(a) Promulgation of rules and regulations**

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

(b) "Program or activity" defined

For the purposes of this section, the term "program or activity" means all of the operations of--

   **(1)(A)** a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

   **(B)** the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

   **(2)(A)** a college, university, or other postsecondary institution, or a public system of higher education; or

   **(B)** a local educational agency (as defined in section 7801 of Title 20), system of career and technical education, or other school system;

   **(3)(A)** an entire corporation, partnership, or other private organization, or an entire sole proprietorship--

      **(i)** if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

Add-6

**(ii)** which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

**(B)** the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

**(4)** any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.

## (c) Significant structural alterations by small providers

Small providers are not required by subsection (a) to make significant structural alterations to their existing facilities for the purpose of assuring program accessibility, if alternative means of providing the services are available. The terms used in this subsection shall be construed with reference to the regulations existing on March 22, 1988.

## (d) Standards used in determining violation of section

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment.

## CREDIT(S)

(Pub.L. 93-112, Title V, § 504, Sept. 26, 1973, 87 Stat. 394; Pub.L. 95-602, Title I, §§ 119, 122(d)(2), Nov. 6, 1978, 92 Stat. 2982, 2987; Pub.L. 99-506, Title I, § 103(d)(2)(B), Title X, § 1002(e)(4), Oct. 21, 1986, 100 Stat. 1810, 1844; Pub.L. 100-259, § 4, Mar. 22, 1988, 102 Stat. 29; Pub.L. 100-630, Title II, § 206(d), Nov. 7, 1988, 102 Stat. 3312; Pub.L. 102-569, Title I, § 102(p)(32), Title V, § 506, Oct. 29, 1992, 106 Stat. 4360, 4428; Pub.L. 103-382, Title III, § 394(i)(2), Oct. 20, 1994, 108 Stat. 4029; Pub.L. 105-220, Title IV, § 408(a)(3), Aug. 7, 1998, 112 Stat. 1203; Pub.L. 107-110, Title X, § 1076(u)(2), Jan. 8, 2002, 115 Stat. 2093; Pub.L. 113-128, Title IV, § 456(c), July 22, 2014, 128 Stat. 1675; Pub.L. 114-95, Title IX, § 9215(mmm)(3), Dec. 10, 2015, 129 Stat. 2188.)

29 U.S.C.A. § 794, 29 USCA § 794
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                        2

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter II. Public Services (Refs & Annos)
        Part A. Prohibition Against Discrimination and Other Generally Applicable Provisions

42 U.S.C.A. § 12131

## § 12131. Definitions

*Currentness*

As used in this subchapter:

**(1) Public entity**

The term "public entity" means--

**(A)** any State or local government;

**(B)** any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

**(C)** the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

**(2) Qualified individual with a disability**

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

**CREDIT(S)**

(Pub.L. 101-336, Title II, § 201, July 26, 1990, 104 Stat. 337.)

42 U.S.C.A. § 12131, 42 USCA § 12131
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-8

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter II. Public Services (Refs & Annos)
        Part A. Prohibition Against Discrimination and Other Generally Applicable Provisions

42 U.S.C.A. § 12132

§ 12132. Discrimination

Currentness

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

**CREDIT(S)**

(Pub.L. 101-336, Title II, § 202, July 26, 1990, 104 Stat. 337.)

42 U.S.C.A. § 12132, 42 USCA § 12132
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-9

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 21. Civil Rights (Refs & Annos)
      Subchapter V. Federally Assisted Programs (Refs & Annos)

42 U.S.C.A. § 2000d-7

§ 2000d-7. Civil rights remedies equalization

Currentness

**(a) General provision**

**(1)** A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

**(2)** In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

**(b) Effective date**

The provisions of subsection (a) shall take effect with respect to violations that occur in whole or in part after October 21, 1986.

**CREDIT(S)**

(Pub.L. 99-506, Title X, § 1003, Oct. 21, 1986, 100 Stat. 1845.)

42 U.S.C.A. § 2000d-7, 42 USCA § 2000d-7
Current through P.L. 117-102. Some statute sections may be more current, see credits for details.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-10

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
    Business and Professions Code (Refs & Annos)
        Division 3. Professions and Vocations Generally (Refs & Annos)
            Chapter 4. Attorneys (Refs & Annos)
                Article 1. General Provisions (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 6001

§ 6001. State Bar; perpetual succession; seal; powers; authority to raise revenue; limits on sale or disclosure of member information; laws applicable

Effective: January 1, 2019 to December 31, 2022
Currentness

<Section operative until Jan. 1, 2023. See, also, § 6001 operative Jan. 1, 2023.>

The State Bar of California is a public corporation. It is hereinafter designated as the State Bar.

The State Bar has perpetual succession and a seal and it may sue and be sued. It may, for the purpose of carrying into effect and promoting its objectives:

(a) Make contracts.

(b) Borrow money, contract debts, issue bonds, notes and debentures and secure the payment or performance of its obligations.

(c) Own, hold, use, manage and deal in and with real and personal property.

(d) Construct, alter, maintain and repair buildings and other improvements to real property.

(e) Purchase, lease, obtain options upon, acquire by gift, bequest, devise or otherwise, any real or personal property or any interest therein.

(f) Sell, lease, exchange, convey, transfer, assign, encumber, pledge, dispose of any of its real or personal property or any interest therein, including without limitation all or any portion of its income or revenues from license fees paid or payable by licensees.

(g) Do all other acts incidental to the foregoing or necessary or expedient for the administration of its affairs and the attainment of its purposes.

Pursuant to those powers enumerated in subdivisions (a) to (g), inclusive, it is recognized that the State Bar has authority to raise revenue in addition to that provided for in Section 6140 and other statutory provisions. The State Bar is empowered to raise

Add-11

that additional revenue by any lawful means. However, as of March 31, 2018, the State Bar shall not create any foundations or nonprofit corporations.

The State Bar shall conspicuously publicize to its licensees in the annual fees statement and other appropriate communications, including its Internet Web site and electronic communications, that its licensees have the right to limit the sale or disclosure of licensee information not reasonably related to regulatory purposes. In those communications the State Bar shall note the location of the State Bar's privacy policy, and shall also note the simple procedure by which a licensee may exercise his or her right to prohibit or restrict, at the licensee's option, the sale or disclosure of licensee information not reasonably related to regulatory purposes. On or before May 1, 2005, the State Bar shall report to the Assembly and Senate Committees on Judiciary regarding the procedures that it has in place to ensure that licensees can appropriately limit the use of their licensee information not reasonably related to regulatory purposes, and the number of licensees choosing to utilize these procedures.

No law of this state restricting, or prescribing a mode of procedure for the exercise of powers of state public bodies or state agencies, or classes thereof, including, but not by way of limitation, the provisions contained in Division 3 (commencing with Section 11000), Division 4 (commencing with Section 16100), and Part 1 (commencing with Section 18000) and Part 2 (commencing with Section 18500) of Division 5, of Title 2 of the Government Code, shall be applicable to the State Bar, unless the Legislature expressly so declares. Notwithstanding the foregoing or any other law, pursuant to Sections 6026.7 and 6026.11, the State Bar is subject to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code) and, commencing April 1, 2016, the Bagley-Keene Open Meeting Act (Article 9 (commencing with Section 11120) of Chapter 1 of Part 1 of Division 3 of Title 2 of the Government Code).

## Credits

(Added by Stats.1939, c. 34, p. 347, § 1. Amended by Stats.1957, c. 1526, p. 2876, § 1; Stats.1978, c. 380, p. 1123, § 4; Stats.1988, c. 1149, § 1; Stats.2004, c. 356 (A.B.3080), § 1; Stats.2015, c. 537 (S.B.387), § 1, eff. Jan. 1, 2016; Stats.2017, c. 422 (S.B.36), § 1, eff. Jan. 1, 2018; Stats.2018, c. 659 (A.B.3249), § 2, eff. Jan. 1, 2019.)

West's Ann. Cal. Bus. & Prof. Code § 6001, CA BUS & PROF § 6001

Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-12

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
    Business and Professions Code (Refs & Annos)
      Division 3. Professions and Vocations Generally (Refs & Annos)
        Chapter 4. Attorneys (Refs & Annos)
          Article 1. General Provisions (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 6008

§ 6008. Property; exemption from taxation

Currentness

All property of the State Bar is hereby declared to be held for essential public and governmental purposes in the judicial branch of the government and such property is exempt from all taxes of the State or any city, city and county, district, public corporation, or other political subdivision, public body or public agency.

**Credits**

(Added by Stats.1957, c. 1526, p. 2877, § 2.)

West's Ann. Cal. Bus. & Prof. Code § 6008, CA BUS & PROF § 6008
Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

---

End of Document        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-13

West's Annotated California Codes
   Business and Professions Code (Refs & Annos)
    Division 3. Professions and Vocations Generally (Refs & Annos)
     Chapter 4. Attorneys (Refs & Annos)
      Article 1. General Provisions (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 6008.1

## § 6008.1. Bonds, notes, etc.; liability; approval

Effective: January 1, 2019
Currentness

No bond, note, debenture, evidence of indebtedness, mortgage, deed of trust, assignment, pledge, contract, lease, agreement, or other contractual obligation of the State Bar shall:

(a) Create a debt or other liability of the state nor of any entity other than the State Bar (or any successor public corporation).

(b) Create any personal liability on the part of the licensees of the State Bar or the members of the board of trustees or any person executing the same, by reason of the issuance or execution thereof.

(c) Be required to be approved or authorized under the provisions of any other law or regulation of this state.

**Credits**

(Added by Stats.1957, c. 1526, p. 2877, § 3. Amended by Stats.2011, c. 417 (S.B.163), § 6; Stats.2018, c. 659 (A.B.3249), § 13, eff. Jan. 1, 2019.)

West's Ann. Cal. Bus. & Prof. Code § 6008.1, CA BUS & PROF § 6008.1
Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-14

West's Annotated California Codes
   Business and Professions Code (Refs & Annos)
    Division 3. Professions and Vocations Generally (Refs & Annos)
     Chapter 4. Attorneys (Refs & Annos)
      Article 1. General Provisions (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 6008.2

## § 6008.2. Bonds, notes, etc.; exemption from taxation

Currentness

Bonds, notes, debentures and other evidences of indebtedness of the State Bar are hereby declared to be issued for essential public and governmental purposes in the judicial branch of the government and, together with interest thereon and income therefrom, shall be exempt from taxes.

**Credits**
(Added by Stats.1957, c. 1526, p. 2878, § 4.)

West's Ann. Cal. Bus. & Prof. Code § 6008.2, CA BUS & PROF § 6008.2
Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-15

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
    Business and Professions Code (Refs & Annos)
        Division 3. Professions and Vocations Generally (Refs & Annos)
            Chapter 4. Attorneys (Refs & Annos)
                Article 4. Admission to the Practice of Law (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 6063

§ 6063. Fees

Currentness

Applicants for admission to practice shall pay such reasonable fees, fixed by the board, as may be necessary to defray the expense of administering the provisions of this chapter, relating to admission to practice. These fees shall be collected by the examining committee and paid into the treasury of the State Bar.

**Credits**

(Added by Stats.1939, c. 34, p. 354, § 1.)

West's Ann. Cal. Bus. & Prof. Code § 6063, CA BUS & PROF § 6063
Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-16

---

West's Annotated California Codes
  Business and Professions Code (Refs & Annos)
    Division 3. Professions and Vocations Generally (Refs & Annos)
      Chapter 4. Attorneys (Refs & Annos)
        Article 8. Revenue (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 6140

§ 6140. Annual license fee; amount; payment

Effective: January 1, 2022
Currentness

(a) The board shall fix the annual license fee for active licensees for 2022 at a sum not exceeding three hundred ninety-five dollars ($395).

(b) The annual license fee for active licensees is payable on or before the first day of February of each year. If the board finds it appropriate and feasible, it may provide by rule for payment of fees on an installment basis with interest, by credit card, or other means, and may charge licensees choosing any alternative method of payment an additional fee to defray costs incurred by that election.

(c) This section shall remain in effect only until January 1, 2023, and as of that date is repealed.

**Credits**
(Added by Stats.2017, c. 422 (S.B.36), § 29, eff. Jan. 1, 2018. Amended by Stats.2018, c. 659 (A.B.3249), § 93, eff. Jan. 1, 2019; Stats.2019, c. 698 (S.B.176), § 11, eff. Jan. 1, 2020; Stats.2020, c. 360 (A.B.3362), § 6, eff. Jan. 1, 2021; Stats.2021, c. 723 (S.B.211), § 6, eff. Jan. 1, 2022.)

West's Ann. Cal. Bus. & Prof. Code § 6140, CA BUS & PROF § 6140
Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-17

---

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 51

## § 51. Unruh Civil Rights Act; equal rights; business establishments; violations of federal Americans with Disabilities Act

Effective: January 1, 2016
Currentness

(a) This section shall be known, and may be cited, as the Unruh Civil Rights Act.

(b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

(c) This section shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike to persons of every sex, color, race, religion, ancestry, national origin, disability, medical condition, marital status, sexual orientation, citizenship, primary language, or immigration status, or to persons regardless of their genetic information.

(d) Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor shall anything in this section be construed to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

(e) For purposes of this section:

(1) "Disability" means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code.

(2)(A) "Genetic information" means, with respect to any individual, information about any of the following:

(i) The individual's genetic tests.

(ii) The genetic tests of family members of the individual.

Add-18

(iii) The manifestation of a disease or disorder in family members of the individual.

(B) "Genetic information" includes any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

(C) "Genetic information" does not include information about the sex or age of any individual.

(3) "Medical condition" has the same meaning as defined in subdivision (i) of Section 12926 of the Government Code.

(4) "Religion" includes all aspects of religious belief, observance, and practice.

(5) "Sex" includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth. "Sex" also includes, but is not limited to, a person's gender. "Gender" means sex, and includes a person's gender identity and gender expression. "Gender expression" means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth.

(6) "Sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status" includes a perception that the person has any particular characteristic or characteristics within the listed categories or that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics within the listed categories.

(7) "Sexual orientation" has the same meaning as defined in subdivision (s) of Section 12926 of the Government Code.

(f) A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336)[1] shall also constitute a violation of this section.

(g) Verification of immigration status and any discrimination based upon verified immigration status, where required by federal law, shall not constitute a violation of this section.

(h) Nothing in this section shall be construed to require the provision of services or documents in a language other than English, beyond that which is otherwise required by other provisions of federal, state, or local law, including Section 1632.

**Credits**
(Added by Stats.1905, c. 413, p. 553, § 1. Amended by Stats.1919, c. 210, p. 309, § 1; Stats.1923, c. 235, p. 485, § 1; Stats.1959, c. 1866, p. 4424, § 1; Stats.1961, c. 1187, p. 2920, § 1; Stats.1974, c. 1193, p. 2568, § 1; Stats.1987, c. 159, § 1; Stats.1992, c. 913 (A.B.1077), § 3; Stats.1998, c. 195 (A.B.2702), § 1; Stats.2000, c. 1049 (A.B.2222), § 2; Stats.2005, c. 420 (A.B.1400), § 3; Stats.2011, c. 261 (S.B.559), § 3; Stats.2011, c. 719 (A.B.887), § 1.5; Stats.2015, c. 303 (A.B.731), § 25, eff. Jan. 1, 2016; Stats.2015, c. 282 (S.B.600), § 1, eff. Jan. 1, 2016.)

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Footnotes

1      For public law sections classified to the U.S.C.A., see USCA-Tables.

West's Ann. Cal. Civ. Code § 51, CA CIVIL § 51

Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Annotated California Codes
   Civil Code (Refs & Annos)
      Division 1. Persons (Refs & Annos)
         Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 52

§ 52. Denial of civil rights or discrimination; damages; civil action by persons
aggrieved; intervention; unlawful practice complaint; waiver of rights by contract

Effective: January 1, 2015

Currentness

(a) Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6.

(b) Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following:

(1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.

(2) A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the Attorney General, a district attorney, or a city attorney. An action for that penalty brought pursuant to Section 51.7 shall be commenced within three years of the alleged practice.

(3) Attorney's fees as may be determined by the court.

(c) Whenever there is reasonable cause to believe that any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights described in this section, and that conduct is of that nature and is intended to deny the full exercise of those rights, the Attorney General, any district attorney or city attorney, or any person aggrieved by the conduct may bring a civil action in the appropriate court by filing with it a complaint. The complaint shall contain the following:

(1) The signature of the officer, or, in his or her absence, the individual acting on behalf of the officer, or the signature of the person aggrieved.

(2) The facts pertaining to the conduct.

Add-21

§ 52. Denial of civil rights or discrimination; damages; civil action..., CA CIVIL § 52

(3) A request for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the complainant deems necessary to ensure the full enjoyment of the rights described in this section.

(d) Whenever an action has been commenced in any court seeking relief from the denial of equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States on account of race, color, religion, sex, national origin, or disability, the Attorney General or any district attorney or city attorney for or in the name of the people of the State of California may intervene in the action upon timely application if the Attorney General or any district attorney or city attorney certifies that the case is of general public importance. In that action, the people of the State of California shall be entitled to the same relief as if it had instituted the action.

(e) Actions brought pursuant to this section are independent of any other actions, remedies, or procedures that may be available to an aggrieved party pursuant to any other law.

(f) Any person claiming to be aggrieved by an alleged unlawful practice in violation of Section 51 or 51.7 may also file a verified complaint with the Department of Fair Employment and Housing pursuant to Section 12948 of the Government Code.

(g) This section does not require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required by other provisions of law, to any new or existing establishment, facility, building, improvement, or any other structure, nor does this section augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modifications that the State Architect otherwise possesses pursuant to other laws.

(h) For the purposes of this section, "actual damages" means special and general damages. This subdivision is declaratory of existing law.

(i) Subdivisions (b) to (f), inclusive, shall not be waived by contract except as provided in Section 51.7.

**Credits**

(Added by Stats.1905, c. 413, p. 553, § 2. Amended by Stats.1919, c. 210, p. 309, § 2; Stats.1923, c. 235, p. 485, § 2; Stats.1959, c. 1866, p. 4424, § 2; Stats.1974, c. 1193, p. 2568, § 2; Stats.1976, c. 366, p. 1013, § 2; Stats.1976, c. 1293, p. 5778, § 2.5; Stats.1978, c. 1212, p. 3927, § 1; Stats.1981, c. 521, § 1, eff. Sept. 16, 1981; Stats.1986, c. 244, § 1; Stats.1987, c. 159, § 4; Stats.1989, c. 459, § 1; Stats.1991, c. 607 (S.B.98), § 2; Stats.1991, c. 839 (A.B.1169), § 2; Stats.1992, c. 913 (A.B.1077), § 3.6; Stats.1994, c. 535 (S.B.1288), § 1; Stats.1998, c. 195 (A.B.2702), § 4; Stats.1999, c. 964 (A.B.519), § 2; Stats.2000, c. 98 (A.B.2719), § 2; Stats.2001, c. 261 (A.B.587), § 1; Stats.2005, c. 123 (A.B.378), § 1; Stats.2014, c. 910 (A.B.2617), § 3, eff. Jan. 1, 2015.)

West's Ann. Cal. Civ. Code § 52, CA CIVIL § 52

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**§ 52. Denial of civil rights or discrimination; damages; civil action..., CA CIVIL § 52**

Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                               © 2022 Thomson Reuters. No claim to original U.S. Government Works.

§ 945.4. Necessity of written claim acted upon by board or..., CA GOVT § 945.4

---

West's Annotated California Codes
   Government Code (Refs & Annos)
    Title 1. General
     Division 3.6. Claims and Actions Against Public Entities and Public Employees (Refs & Annos)
     Part 4. Actions Against Public Entities and Public Employees (Refs & Annos)
      Chapter 2. Actions Against Public Entities (Refs & Annos)

West's Ann.Cal.Gov.Code § 945.4

§ 945.4. Necessity of written claim acted upon by board or deemed to have been rejected

Currentness

Except as provided in Sections 946.4 and 946.6, no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) of Part 3 of this division until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board, in accordance with Chapters 1 and 2 of Part 3 of this division.

**Credits**
(Added by Stats.1963, c. 1715, p. 3383, § 2. Amended by Stats.1965, c. 653, p. 2014, § 17.)

West's Ann. Cal. Gov. Code § 945.4, CA GOVT § 945.4
Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-24

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
  Government Code (Refs & Annos)
    Title 2. Government of the State of California
      Division 3. Executive Department (Refs & Annos)
        Part 1. State Departments and Agencies (Refs & Annos)
          Chapter 1. State Agencies (Refs & Annos)
            Article 9.5. Discrimination (Refs & Annos)

West's Ann.Cal.Gov.Code § 11135

§ 11135. Programs or activities funded by state; discrimination on basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation; federal act; definitions; legislative findings and declarations

Effective: January 1, 2017
Currentness

(a) No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Notwithstanding Section 11000, this section applies to the California State University.

(b) With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

(c) The protected bases referenced in this section have the same meanings as those terms are defined in Section 12926.

(d) The protected bases used in this section include a perception that a person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics.

**Credits**
(Added by Stats.1977, c. 972, p. 2942, § 1. Amended by Stats.1992, c. 913 (A.B.1077), § 18; Stats.1994, c. 146 (A.B.3601), § 66; Stats.2001, c. 708 (A.B.677), § 1; Stats.2002, c. 300 (A.B.3035), § 4; Stats.2002, c. 1102 (S.B.105), § 2.5; Stats.2003, c. 784 (S.B.302), § 1; Stats.2005, c. 706 (A.B.1742), § 20; Stats.2006, c. 182 (S.B.1441), § 1; Stats.2011, c. 261 (S.B.559), § 6; Stats.2016, c. 870 (S.B.1442), § 4, eff. Jan. 1, 2017.)

Add-25

West's Ann. Cal. Gov. Code § 11135, CA GOVT § 11135

Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
    Government Code (Refs & Annos)
        Title 2. Government of the State of California
            Division 3. Executive Department (Refs & Annos)
                Part 2.8. Department of Fair Employment and Housing (Refs & Annos)
                    Chapter 6. Discrimination Prohibited (Refs & Annos)
                        Article 1. Unlawful Practices, Generally (Refs & Annos)

West's Ann.Cal.Gov.Code § 12944

## § 12944. Licensing boards; unlawful acts based on examinations and qualifications; determination of unlawfulness; inquiries; reasonable accommodations; records

Effective: July 1, 2013
Currentness

(a) It shall be unlawful for a licensing board to require any examination or establish any other qualification for licensing that has an adverse impact on any class by virtue of its race, creed, color, national origin or ancestry, sex, gender, gender identity, gender expression, age, medical condition, genetic information, physical disability, mental disability, or sexual orientation, unless the practice can be demonstrated to be job related.

Where the commission, after hearing, determines that an examination is unlawful under this subdivision, the licensing board may continue to use and rely on the examination until such time as judicial review by the superior court of the determination is exhausted.

If an examination or other qualification for licensing is determined to be unlawful under this section, that determination shall not void, limit, repeal, or otherwise affect any right, privilege, status, or responsibility previously conferred upon any person by the examination or by a license issued in reliance on the examination or qualification.

(b) It shall be unlawful for a licensing board to fail or refuse to make reasonable accommodation to an individual's mental or physical disability or medical condition.

(c) It shall be unlawful for any licensing board, unless specifically acting in accordance with federal equal employment opportunity guidelines or regulations approved by the commission, to print or circulate or cause to be printed or circulated any publication, or to make any non-job-related inquiry, either verbal or through use of an application form, which expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, sex, gender, gender identity, gender expression, age, or sexual orientation or any intent to make any such limitation, specification, or discrimination. Nothing in this subdivision shall prohibit any licensing board from making, in connection with prospective licensure or certification, an inquiry as to, or a request for information regarding, the physical fitness of applicants if that inquiry or request for information is directly related and pertinent to the license or the licensed position the applicant is applying for. Nothing in this subdivision shall prohibit any licensing board, in connection with prospective examinations, licensure, or certification, from inviting individuals with physical or mental disabilities to request reasonable accommodations or from making inquiries related to reasonable accommodations.

Add-27

(d) It is unlawful for a licensing board to discriminate against any person because the person has filed a complaint, testified, or assisted in any proceeding under this part.

(e) It is unlawful for any licensing board to fail to keep records of applications for licensing or certification for a period of two years following the date of receipt of the applications.

(f) As used in this section, "licensing board" means any state board, agency, or authority in the Business, Consumer Services, and Housing Agency that has the authority to grant licenses or certificates which are prerequisites to employment eligibility or professional status.

**Credits**

(Added by Stats.1980, c. 992, § 4. Amended by Stats.1992, c. 912 (A.B.1286), § 6; Stats.1992, c. 913 (A.B.1077), § 24; Stats.1999, c. 592 (A.B.1001), § 8; Stats.2011, c. 261 (S.B.559), § 15; Stats.2011, c. 719 (A.B.887), § 19.5; Stats.2012, c. 46 (S.B.1038), § 37, eff. June 27, 2012, operative Jan. 1, 2013; Gov.Reorg.Plan No. 2 of 2011-2012, § 210, eff. July 3, 2012, operative July 1, 2013; Stats.2012, c. 147 (S.B.1039), § 17, operative July 1, 2013.)

West's Ann. Cal. Gov. Code § 12944, CA GOVT § 12944

Current with urgency legislation through Ch. 14 of 2022 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-28

West's Annotated California Codes
  California Rules of Court (Refs & Annos)
    Title 9. Rules on Law Practice, Attorneys, and Judges (Refs & Annos)
      Division 2. Attorney Admission and Disciplinary Proceedings and Review of State Bar Proceedings (Refs & Annos)
        Chapter 3. Attorney Disciplinary Proceedings (Refs & Annos)

Cal.Rules of Court, Rule 9.13

Formerly cited as CA ST MISC Rule 952

## Rule 9.13. Review of State Bar Court decisions

Currentness

**(a) Review of recommendation of disbarment or suspension**

A petition to the Supreme Court by a licensee to review a decision of the State Bar Court recommending his or her disbarment or suspension from practice must be served and filed within 60 days after a certified copy of the decision complained of is filed with the Clerk of the Supreme Court. The State Bar may serve and file an answer to the petition within 15 days after filing of the petition. Within 5 days after filing of the answer, the petitioner may serve and file a reply. If review is ordered by the Supreme Court, the State Bar must serve and file a supplemental brief within 45 days after the order is filed. Within 15 days after filing of the supplemental brief, the petitioner may serve and file a reply brief.

**(b) Review of recommendation to set aside stay of suspension or modify probation**

A petition to the Supreme Court by a licensee to review a recommendation of the State Bar Court that a stay of an order of suspension be set aside or that the duration or conditions of probation be modified on account of a violation of probation must be served and filed within 15 days after a certified copy of the recommendation complained of is filed with the Clerk of the Supreme Court. Within 15 days after filing of the petition, the State Bar may serve and file an answer. Within 5 days after filing of the answer, the petitioner may serve and file a reply.

**(c) Review of interim decisions**

A petition to the Supreme Court by a licensee to review a decision of the State Bar Court regarding interim suspension, the exercise of powers delegated by rule 9.10(b)-(e), or another interlocutory matter must be served and filed within 15 days after written notice of the adverse decision of the State Bar Court is mailed by the State Bar to the petitioner and to his or her counsel of record, if any, at their respective addresses under section 6002.1. Within 15 days after filing of the petition, the State Bar may serve and file an answer. Within 5 days after filing of the answer, the petitioner may serve and file a reply.

**(d) Review of other decisions**

A petition to the Supreme Court to review any other decision of the State Bar Court or action of the Board of Trustees of the State Bar, or of any board or committee appointed by it and authorized to make a determination under the provisions of the State Bar Act, or of the chief executive officer of the State Bar or the designee of the chief executive officer authorized to make a determination under article 10 of the State Bar Act or these rules of court, must be served and filed within 60 days

Add-29

after written notice of the action complained of is mailed to the petitioner and to his or her counsel of record, if any, at their respective addresses under Business and Professions Code section 6002.1. Within 15 days after filing of the petition, the State Bar may serve and file an answer and brief. Within 5 days after filing of the answer and brief, the petitioner may serve and file a reply. If review is ordered by the Supreme Court, the State Bar, within 45 days after filing of the order, may serve and file a supplemental brief. Within 15 days after filing of the supplemental brief, the petitioner may serve and file a reply brief.

**(e) Contents of petition**

(1) A petition to the Supreme Court filed under (a) or (b) of this rule must be verified, must specify the grounds relied upon, must show that review within the State Bar Court has been exhausted, must address why review is appropriate under one or more of the grounds specified in rule 9.16, and must have attached a copy of the State Bar Court decision from which relief is sought.

(2) When review is sought under (c) or (d) of this rule, the petition must also be accompanied by a record adequate to permit review of the ruling, including:

(A) Legible copies of all documents and exhibits submitted to the State Bar Court or the State Bar supporting and opposing petitioner's position;

(B) Legible copies of all other documents submitted to the State Bar Court or the State Bar that are necessary for a complete understanding of the case and the ruling; and

(C) A transcript of the proceedings in the State Bar Court leading to the decision or, if a transcript is unavailable, a declaration by counsel explaining why a transcript is unavailable and fairly summarizing the proceedings, including arguments by counsel and the basis of the State Bar Court's decision, if stated; or a declaration by counsel stating that the transcript has been ordered, the date it was ordered, and the date it is expected to be filed, which must be a date before any action is requested from the Supreme Court other than issuance of a stay supported by other parts of the record.

(3) A petitioner who requests an immediate stay must explain in the petition the reasons for the urgency and set forth all relevant time constraints.

(4) If a petitioner does not submit the required record, the court may summarily deny the stay request, the petition, or both.

**(f) Service**

All petitions, briefs, reply briefs, and other pleadings filed by a petitioner under this rule must be accompanied by proof of service of three copies on the General Counsel of the State Bar at the San Francisco office of the State Bar, and of one copy on the Clerk of the State Bar Court at the Los Angeles office of the State Bar Court. The State Bar must serve the licensee at his or her address under Business and Professions Code section 6002.1, and his or her counsel of record, if any.

**Credits**
(Formerly Rule 59, adopted by Supreme Court, eff. April 20, 1943; adopted by Judicial Council, eff. July 1, 1943. As amended eff. July 1, 1968. Renumbered Rule 952 and amended eff. Oct. 1, 1973. As amended, eff. Jan. 1, 1976; May 1, 1986; April

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2, 1987; Dec. 1, 1990; Feb. 1, 1991; March 15, 1991. Renumbered Rule 9.13 and amended, eff. Jan. 1, 2007. As amended, eff. Jan. 1, 2019.)

Cal. Rules of Court, Rule 9.13, CA ST PRACTICE Rule 9.13
Current with amendments received through March 15, 2022.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
   Rules of the State Bar of California (Refs & Annos)
      Title 4. Admissions and Educational Standards (Refs & Annos)
         Division 1. Admission to Practice Law in California (Refs & Annos)
            Chapter 1. General Provisions

State Bar Rule 4.2

Rule 4.2. Scope of Rules

Currentness

These rules apply to persons seeking to practice law in California. Nothing in these rules may be construed as affecting the power of the California Supreme Court to exercise its inherent jurisdiction over the practice of law in California.

**Credits**

(Adopted, eff. Sept. 1, 2008. As amended, eff. Sept. 1, 2019.)

State Bar Rule 4.2, CA ST RULES OF STATE BAR Rule 4.2
Current with amendments received through 1/1/22.

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-32

Code of Federal Regulations
    Title 28. Judicial Administration
        Chapter I. Department of Justice
            Part 35. Nondiscrimination on the Basis of Disability in State and Local Government Services (Refs & Annos)
                Subpart B. General Requirements

28 C.F.R. § 35.130

§ 35.130 General prohibitions against discrimination.

Effective: October 11, 2016
Currentness

<For statute(s) affecting validity, see: 42 U.S.C.A. § 12101 et seq.>

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

Add-33

(vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

Add-34

(7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(ii) A public entity is not required to provide a reasonable modification to an individual who meets the definition of "disability" solely under the "regarded as" prong of the definition of "disability" at § 35.108(a)(1)(iii).

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

(c) Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d) A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)(1) Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(2) Nothing in the Act or this part authorizes the representative or guardian of an individual with a disability to decline food, water, medical treatment, or medical services for that individual.

(f) A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

(h) A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

(i) Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of disability, including a claim that an individual with a disability was granted a reasonable modification that was denied to an individual without a disability.

Add-35

**§ 35.130 General prohibitions against discrimination., 28 C.F.R. § 35.130**

**Credits**

[Order No. 3180–2010, 75 FR 56178, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53225, Aug. 11, 2016]

SOURCE: 56 FR 35716, July 26, 1991; 75 FR 56177, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53223, Aug. 11, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12134, 12131, and 12205a.

Notes of Decisions (1863)

Current through March 31, 2022; 87 FR 18739.

---

End of Document                         © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-36

§ 36.309 Examinations and courses., 28 C.F.R. § 36.309

---

Code of Federal Regulations
  Title 28. Judicial Administration
    Chapter I. Department of Justice
      Part 36. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities (Refs & Annos)
        Subpart C. Specific Requirements

28 C.F.R. § 36.309

§ 36.309 Examinations and courses.

Effective: March 15, 2011
Currentness

(a) General. Any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

(b) Examinations.

(1) Any private entity offering an examination covered by this section must assure that—

(i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

(ii) An examination that is designed for individuals with impaired sensory, manual, or speaking skills is offered at equally convenient locations, as often, and in as timely a manner as are other examinations; and

(iii) The examination is administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements are made.

(iv) Any request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

(v) When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response

Add-37

to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan).

(vi) The entity responds in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

(2) Required modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given.

(3) A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden. Auxiliary aids and services required by this section may include taped examinations, interpreters or other effective methods of making orally delivered materials available to individuals with hearing impairments, Brailled or large print examinations and answer sheets or qualified readers for individuals with visual impairments or learning disabilities, transcribers for individuals with manual impairments, and other similar services and actions.

(4) Alternative accessible arrangements may include, for example, provision of an examination at an individual's home with a proctor if accessible facilities or equipment are unavailable. Alternative arrangements must provide comparable conditions to those provided for nondisabled individuals.

(c) Courses.

(1) Any private entity that offers a course covered by this section must make such modifications to that course as are necessary to ensure that the place and manner in which the course is given are accessible to individuals with disabilities.

(2) Required modifications may include changes in the length of time permitted for the completion of the course, substitution of specific requirements, or adaptation of the manner in which the course is conducted or course materials are distributed.

(3) A private entity that offers a course covered by this section shall provide appropriate auxiliary aids and services for persons with impaired sensory, manual, or speaking skills, unless the private entity can demonstrate that offering a particular auxiliary aid or service would fundamentally alter the course or would result in an undue burden. Auxiliary aids and services required by this section may include taped texts, interpreters or other effective methods of making orally delivered materials available to individuals with hearing impairments, Brailled or large print texts or qualified readers for individuals with visual impairments and learning disabilities, classroom equipment adapted for use by individuals with manual impairments, and other similar services and actions.

Add-38

**§ 36.309 Examinations and courses., 28 C.F.R. § 36.309**

(4) Courses must be administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements must be made.

(5) Alternative accessible arrangements may include, for example, provision of the course through videotape, cassettes, or prepared notes. Alternative arrangements must provide comparable conditions to those provided for nondisabled individuals.

**Credits**

[Order No. 3181–2010, 75 FR 56255, Sept. 15, 2010]

SOURCE: 56 FR 35592, July 26, 1991; 58 FR 17522, April 5, 1993; 59 FR 2675, Jan. 18, 1994; 59 FR 17446, April 12, 1994; Order No. 2249–99, 64 FR 47103, Aug. 30, 1999; Order No. 3181–2010, 75 FR 56250, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53240, Aug. 11, 2016; Order No. 3779–2016, 81 FR 87378, Dec. 2, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12186(b), 12205a.

Notes of Decisions (41)

Current through March 31, 2022; 87 FR 18739.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add-39

Code of Federal Regulations
　　Title 28. Judicial Administration
　　　Chapter I. Department of Justice
　　　　Part 35. Nondiscrimination on the Basis of Disability in State and Local Government Services (Refs & Annos)

28 C.F.R. Pt. 35, App. A

APPENDIX A TO PART 35—GUIDANCE TO REVISIONS TO ADA REGULATION ON NONDISCRIMINATION ON THE BASIS OF DISABILITY IN STATE AND LOCAL GOVERNMENT SERVICES

Effective: March 15, 2011
Currentness

Note: This Appendix contains guidance providing a section-by-section analysis of the revisions to 28 CFR part 35 published on September 15, 2010.

Section–By–Section Analysis and Response to Public Comments

This section provides a detailed description of the Department's changes to the title II regulation, the reasoning behind those changes, and responses to public comments received on these topics. The Section–By–Section Analysis follows the order of the title II regulation itself, except that, if the Department has not changed a regulatory section, the unchanged section has not been mentioned.

Subpart A—General

Section 35.104 Definitions.

"1991 Standards" and "2004 ADAAG"

The Department has included in the final rule new definitions of both the "1991 Standards" and the "2004 ADAAG." The term "1991 Standards" refers to the ADA Standards for Accessible Design, originally published on July 26, 1991, and republished as Appendix D to part 36. The term "2004 ADAAG" refers to ADA Chapter 1, ADA Chapter 2, and Chapters 3 through 10 of the Americans with Disabilities Act and Architectural Barriers Act Accessibility Guidelines, which were issued by the Access Board on July 23, 2004, 36 CFR 1191, app. B and D (2009), and which the Department has adopted in this final rule. These terms are included in the definitions section for ease of reference.

"2010 Standards"

The Department has added to the final rule a definition of the term "2010 Standards." The term "2010 Standards" refers to the 2010 ADA Standards for Accessible Design, which consist of the 2004 ADAAG and the requirements contained in § 35.151.

"Auxiliary Aids and Services"

WESTLAW　© 2022 Thomson Reuters. No claim to original U.S. Government Works.　1

**PAGES OMITTED**

In the NPRM, the Department sought information from the owners and operators of golf courses, both public and private, on the extent to which their courses already have golf car passages, and, if so, whether they intended to avail themselves of the proposed accessible route exception for golf car passages. 73 FR 34466, 34471 (June 17, 2008).

Most commenters expressed support for the adoption of an accessible route requirement that includes an exception permitting golf car passage as all or part of an accessible route. Comments in favor of the proposed standard came from golf course owners and operators, individuals, organizations, and disability rights groups, while comments opposing adoption of the golf course requirements generally came from golf courses and organizations representing the golf course industry.

The majority of commenters expressed the general viewpoint that nearly all golf courses provide golf cars and have either well-defined paths or permit golf cars to drive on the course where paths are not present, thus meeting the accessible route requirement. Several commenters disagreed with the assumption in the initial RIA, that virtually every tee and putting green on an existing course would need to be regraded in order to provide compliant accessible routes. According to one commenter, many golf courses are relatively flat with little slope, especially those heavily used by recreational golfers. This commenter concurred with the Department that it is likely that most existing golf courses have a golf car passage to tees and greens, thereby substantially minimizing the cost of bringing an existing golf course into compliance with the proposed standards. One commenter reported that golf course access audits found that the vast majority of public golf courses would have little difficulty in meeting the proposed golf course requirements. In the view of some commenters, providing access to golf courses would increase golf participation by individuals with disabilities.

The Department also received many comments requesting clarification of the term "golf car passage." For example, one commenter requesting clarification of the term "golf car passage" argued that golf courses typically do not provide golf car paths or pedestrian paths onto the actual teeing grounds or greens, many of which are higher or lower than the car path. This commenter argued that if golf car passages were required to extend onto teeing grounds and greens in order to qualify for an exception, then some golf courses would have to substantially regrade teeing grounds and greens at a high cost.

After careful consideration of the comments, the Department has decided to adopt the 2010 Standards specific to golf facilities. The Department believes that in order for individuals with mobility disabilities to have an opportunity to play golf that is equal to golfers without disabilities, it is essential that golf courses provide an accessible route or accessible golf car passage to connect accessible elements and spaces within the boundary of the golf course, including teeing grounds, putting greens, and weather shelters.

Public Comments on Other NPRM Issues

Equipment and furniture. In the 1991 title II regulation, there are no specific provisions addressing equipment and furniture, although § 35.150(b) states that one means by which a public entity can make its program accessible to individuals with disabilities is "redesign of equipment." In the NPRM, the Department announced its intention not to regulate equipment, proposing instead to continue with the current approach, under which equipment and furniture are covered by other provisions, including those requiring reasonable modifications of policies, practices, or procedures, program accessibility, and effective communication. The Department suggested that entities apply the accessibility standards for fixed equipment in the 2004 ADAAG to analogous free-standing equipment in order to ensure that such equipment is accessible, and that entities consult relevant portions of the 2004 ADAAG and standards from other Federal agencies to make equipment accessible to individuals who are blind or have low vision (e.g., the communication-related standards for ATMs in the 2004 ADAAG).

The Department received numerous comments objecting to this decision and urging the Department to issue equipment and furniture regulations. Based on these comments, the Department has decided that it needs to revisit the issuance of equipment and furniture regulations and it intends to do so in future rulemaking.

Add-42

Among the commenters' key concerns, many from the disability community and some public entities, were objections to the Department's earlier decision not to issue equipment regulations, especially for medical equipment. These groups recommended that the Department list by name certain types of medical equipment that must be accessible, including exam tables (that lower to 15 inches above floor or lower), scales, medical and dental chairs, and radiologic equipment (including mammography equipment). These commenters emphasized that the provision of medically related equipment and furniture should also be specifically regulated since they are not included in the 2004 ADAAG (while depositories, change machines, fuel dispensers, and ATMs were) and because of their crucial role in the provision of healthcare. Commenters described how the lack of accessible medical equipment negatively affects the health of individuals with disabilities. For example, some individuals with mobility disabilities do not get thorough medical care because their health providers do not have accessible examination tables or scales.

Commenters also said that the Department's stated plan to assess the financial impact of free-standing equipment on businesses was not necessary, as any regulations could include a financial balancing test. Other commenters representing persons who are blind or have low vision urged the Department to mandate accessibility for a wide range of equipment—including household appliances (stoves, washers, microwaves, and coffee makers), audiovisual equipment (stereos and DVD players), exercise machines, vending equipment, ATMs, computers at Internet cafes or hotel business centers, reservations kiosks at hotels, and point-of-sale devices—through speech output and tactile labels and controls. They argued that modern technology allows such equipment to be made accessible at minimal cost. According to these commenters, the lack of such accessibility in point-of-sale devices is particularly problematic because it forces blind individuals to provide personal or sensitive information (such as personal identification numbers) to third parties, which exposes them to identity fraud. Because the ADA does not apply directly to the manufacture of products, the Department lacks the authority to issue design requirements for equipment designed exclusively for use in private homes. See Department of Justice, Americans with Disabilities Act, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities, III–4.4200, available at http://www.ada.gov/taman3.

Some commenters urged the Department to require swimming pool operators to provide aquatic wheelchairs for the use of persons with disabilities when the swimming pool has a sloped entry. If there is a sloped entry, a person who uses a wheelchair would require a wheelchair designed for use in the water in order to gain access to the pool because taking a personal wheelchair into water would rust and corrode the metal on the chair and damage any electrical components of a power wheelchair. Providing an aquatic wheelchair made of non-corrosive materials and designed for access into the water will protect the water from contamination and avoid damage to personal wheelchairs or other mobility aids.

Additionally, many commenters urged the Department to regulate the height of beds in accessible hotel guest rooms and to ensure that such beds have clearance at the floor to accommodate a mechanical lift. These commenters noted that in recent years, hotel beds have become higher as hotels use thicker mattresses, thereby making it difficult or impossible for many individuals who use wheelchairs to transfer onto hotel beds. In addition, many hotel beds use a solid-sided platform base with no clearance at the floor, which prevents the use of a portable lift to transfer an individual onto the bed. Consequently, individuals who bring their own lift to transfer onto the bed cannot independently get themselves onto the bed. Some commenters suggested various design options that might avoid these situations.

The Department intends to provide specific guidance relating to both hotel beds and aquatic wheelchairs in a future rulemaking. For the present, the Department reminds covered entities that they have an obligation to undertake reasonable modifications to their current policies and to make their programs accessible to persons with disabilities. In many cases, providing aquatic wheelchairs or adjusting hotel bed heights may be necessary to comply with those requirements.

The Department has decided not to add specific scoping or technical requirements for equipment and furniture in this final rule. Other provisions of the regulation, including those requiring reasonable modifications of policies, practices, or

procedures, program accessibility, and effective communication may require the provision of accessible equipment in individual circumstances. The 1991 title II regulation at § 35.150(a) requires that entities operate each service, program, or activity so that, when viewed in its entirety, each is readily accessible to, and usable by, individuals with disabilities, subject to a defense of fundamental alteration or undue financial and administrative burdens. Section 35.150(b) specifies that such entities may meet their program accessibility obligation through the "redesign of equipment." The Department expects to undertake a rulemaking to address these issues in the near future.

Accessible golf cars. An accessible golf car means a device that is designed and manufactured to be driven on all areas of a golf course, is independently usable by individuals with mobility disabilities, has a hand-operated brake and accelerator, carries golf clubs in an accessible location, and has a seat that both swivels and raises to put the golfer in a standing or semi-standing position.

The 1991 title II regulation contained no language specifically referencing accessible golf cars. After considering the comments addressing the ANPRM's proposed requirement that golf courses make at least one specialized golf car available for the use of individuals with disabilities, and the safety of accessible golf cars and their use on golf course greens, the Department stated in the NPRM that it would not issue regulations specific to golf cars.

The Department received many comments in response to its decision to propose no new regulation specific to accessible golf cars. The majority of commenters urged the Department to require golf courses to provide accessible golf cars. These comments came from individuals, disability advocacy and recreation groups, a manufacturer of accessible golf cars, and representatives of local government. Comments supporting the Department's decision not to propose a new regulation came from golf course owners, associations, and individuals.

Many commenters argued that while the existing title II regulation covered the issue, the Department should nonetheless adopt specific regulatory language requiring golf courses to provide accessible golf cars. Some commenters noted that many local governments and park authorities that operate public golf courses have already provided accessible golf cars. Experience indicates that such golf cars may be used without damaging courses. Some argued that having accessible golf cars would increase golf course revenue by enabling more golfers with disabilities to play the game. Several commenters requested that the Department adopt a regulation specifically requiring each golf course to provide one or more accessible golf cars. Other commenters recommended allowing golf courses to make "pooling" arrangements to meet demands for such cars. A few commenters expressed support for using accessible golf cars to accommodate golfers with and without disabilities. Commenters also pointed out that the Departments of the Interior and Defense have already mandated that golf courses under their jurisdictional control must make accessible golf cars available unless it can be demonstrated that doing so would change the fundamental nature of the game.

While an industry association argued that at least two models of accessible golf cars meet the specifications recognized in the field, and that accessible golf cars cause no more damage to greens or other parts of golf courses than players standing or walking across the course, other commenters expressed concerns about the potential for damage associated with the use of accessible golf cars. Citing safety concerns, golf organizations recommended that an industry safety standard be developed.

Although the Department declines to add specific scoping or technical requirements for golf cars to this final rule, the Department expects to address requirements for accessible golf cars in future rulemaking. In the meantime, the Department believes that golfers with disabilities who need accessible golf cars are protected by other existing provisions in the title II regulation, including those requiring reasonable modifications of policies, practices, or procedures, and program accessibility.

Web site accessibility. Many commenters expressed disappointment that the NPRM did not require title II entities to make their Web sites, through which they offer programs and services, accessible to individuals with disabilities, including those who are blind or have low vision. Commenters argued that the cost of making Web sites accessible, through Web site design, is minimal,

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

yet critical to enabling individuals with disabilities to benefit from the entity's programs and services. Internet Web sites, when accessible, provide individuals with disabilities great independence, and have become an essential tool for many Americans. Commenters recommended that the Department require covered entities, at a minimum, to meet the section 508 Standard for Electronic and Information Technology for Internet accessibility. Under section 508 of the Rehabilitation Act of 1973, Federal agencies are required to make their Web sites accessible. 29 U.S.C. 794(d); 36 CFR 1194.

The Department agrees that the ability to access, on an equal basis, the programs and activities offered by public entities through Internet-based Web sites is of great importance to individuals with disabilities, particularly those who are blind or who have low vision. When the ADA was enacted in 1990, the Internet was unknown to most Americans. Today, the Internet plays a critical role in daily life for personal, civic, commercial, and business purposes. In a period of shrinking resources, public entities increasingly rely on the web as an efficient and comprehensive way to deliver services and to inform and communicate with their citizens and the general public. In light of the growing importance Web sites play in providing access to public services and to disseminating the information citizens need to participate fully in civic life, accessing the Web sites of public entities can play a significant role in fulfilling the goals of the ADA.

Although the language of the ADA does not explicitly mention the Internet, the Department has taken the position that title II covers Internet Web site access. Public entities that choose to provide services through web-based applications (e.g., renewing library books or driver's licenses) or that communicate with their constituents or provide information through the Internet must ensure that individuals with disabilities have equal access to such services or information, unless doing so would result in an undue financial and administrative burden or a fundamental alteration in the nature of the programs, services, or activities being offered. The Department has issued guidance on the ADA as applied to the Web sites of public entities in a 2003 publication entitled, Accessibility of State and Local Government Web sites to People with Disabilities, (June 2003) available at http://www.ada.gov/websites2.htm. As the Department stated in that publication, an agency with an inaccessible Web site may also meet its legal obligations by providing an alternative accessible way for citizens to use the programs or services, such as a staffed telephone information line. However, such an alternative must provide an equal degree of access in terms of hours of operation and the range of options and programs available. For example, if job announcements and application forms are posted on an inaccessible Web site that is available 24 hours a day, seven days a week to individuals without disabilities, then the alternative accessible method must also be available 24 hours a day, 7 days a week. Additional guidance is available in the Web Content Accessibility Guidelines (WCAG), (May 5, 1999) available at http://www.w3.org/TR/WAI-WEBCONTENT (last visited June 24, 2010) which are developed and maintained by the Web Accessibility Initiative, a subgroup of the World Wide Web Consortium (W3C®).

The Department expects to engage in rulemaking relating to website accessibility under the ADA in the near future. The Department has enforced the ADA in the area of website accessibility on a case-by-case basis under existing rules consistent with the guidance noted above, and will continue to do so until the issue is addressed in a final regulation.

Multiple chemical sensitivities. The Department received comments from a number of individuals asking the Department to add specific language to the final rule addressing the needs of individuals with chemical sensitivities. These commenters expressed concern that the presence of chemicals interferes with their ability to participate in a wide range of activities. These commenters also urged the Department to add multiple chemical sensitivities to the definition of a disability.

The Department has determined not to include specific provisions addressing multiple chemical sensitivities in the final rule. In order to be viewed as a disability under the ADA, an impairment must substantially limit one or more major life activities. An individual's major life activities of respiratory or neurological functioning may be substantially limited by allergies or sensitivity to a degree that he or she is a person with a disability. When a person has this type of disability, a covered entity may have to make reasonable modifications in its policies and practices for that person. However, this determination is an individual assessment and must be made on a case-by-case basis.

<div align="center">Add-45</div>

Examinations and Courses. The Department received one comment requesting that it specifically include language regarding examinations and courses in the title II regulation. Because section 309 of the ADA 42 U.S.C. 12189, reaches "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post secondary education, professional, or trade purposes," public entities also are covered by this section of the ADA. Indeed, the requirements contained in title II (including the general prohibitions against discrimination, the program access requirements, the reasonable modifications requirements, and the communications requirements) apply to courses and examinations administered by public entities that meet the requirements of section 309. While the Department considers these requirements to be sufficient to ensure that examinations and courses administered by public entities meet the section 309 requirements, the Department acknowledges that the title III regulation, because it addresses examinations in some detail, is useful as a guide for determining what constitutes discriminatory conduct by a public entity in testing situations. See 28 CFR 36.309.

Hotel Reservations. In the NPRM, at § 36.302(e), the Department proposed adding specific language to title III addressing the requirements that hotels, timeshare resorts, and other places of lodging make reasonable modifications to their policies, practices, or procedures, when necessary to ensure that individuals with disabilities are able to reserve accessible hotel rooms with the same efficiency, immediacy, and convenience as those who do not need accessible guest rooms. The NPRM did not propose adding comparable language to the title II regulation as the Department believes that the general nondiscrimination, program access, effective communication, and reasonable modifications requirements of title II provide sufficient guidance to public entities that operate places of lodging (i.e., lodges in State parks, hotels on public college campuses). The Department received no public comments suggesting that it add language on hotel reservations comparable to that proposed for the title III regulation. Although the Department continues to believe that it is unnecessary to add specific language to the title II regulation on this issue, the Department acknowledges that the title III regulation, because it addresses hotel reservations in some detail, is useful as a guide for determining what constitutes discriminatory conduct by a public entity that operates a reservation system serving a place of lodging. See 28 CFR 36.302(e).

**Credits**

[Order No. 3180–2010, 75 FR 56184, Sept. 15, 2010; 76 FR 14385, 13286, March 11, 2011]

SOURCE: 56 FR 35716, July 26, 1991; 75 FR 56177, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53223, Aug. 11, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12134, 12131, and 12205a.

Current through March 31, 2022; 87 FR 18739.

**Footnotes**

3       The term "existing facility" is defined in § 35.104 as amended by this rule.

4       The Supreme Court in Tennessee v. Lane, 541 U.S. 509, 533–534 (2004), held that title II of the ADA constitutes a valid exercise of Congress' enforcement power under the Fourteenth Amendment in cases implicating the fundamental right of access to the courts.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 28. Judicial Administration
    Chapter I. Department of Justice
      Part 36. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities (Refs & Annos)

28 C.F.R. Pt. 36, App. A

APPENDIX A TO PART 36—GUIDANCE ON REVISIONS TO ADA REGULATION ON NONDISCRIMINATION ON THE BASIS OF DISABILITY BY PUBLIC ACCOMMODATIONS AND COMMERCIAL FACILITIES

Effective: March 15, 2011
Currentness

Note: This Appendix contains guidance providing a section-by-section analysis of the revisions to 28 CFR part 36 published on September 15, 2010.

Section–By–Section Analysis and Response to Public Comments

This section provides a detailed description of the Department's changes to the title III regulation, the reasoning behind those changes, and responses to public comments received on these topics. The Section-by–Section Analysis follows the order of the title III regulation itself, except that if the Department has not changed a regulatory section, the unchanged section has not been mentioned.

Subpart A—General

Section 36.104 Definitions

"1991 Standards" and "2004 ADAAG"

The Department has included in the final rule new definitions of both the "1991 Standards" and the "2004 ADAAG." The term "1991 Standards" refers to the ADA Standards for Accessible Design, originally published on July 26, 1991, and republished as Appendix D to 28 CFR part 36. The term "2004 ADAAG" refers to ADA Chapter 1, ADA Chapter 2, and Chapters 3 through 10 of the Americans with Disabilities Act and the Architectural Barriers Act Accessibility Guidelines, which were issued by the Access Board on July 23, 2004, codified at 36 CFR 1191, app. B and D (2009), and which the Department has adopted in this final rule. These terms are included in the definitions section for ease of reference.

"2010 Standards"

The Department has added to the final rule a definition of the term "2010 Standards." The term "2010 Standards" refers to the 2010 ADA Standards for Accessible Design, which consist of the 2004 ADAAG and the requirements contained in subpart D of 28 CFR part 36.

"Direct Threat"

Add-47

**PAGES OMITTED**

The Department has also decided to remove proposed § 36.308(c)(2) from the final rule. This provision would have required assembly areas with more than 5,000 seats to provide five wheelchair spaces with at least three designated companion seats for each of those five wheelchair spaces. The Department agrees with commenters who asserted that group seating already is addressed more appropriately in ticketing under § 36.302(f).

The Department has determined that proposed § 36.308(c)(1), addressing specialty seating in assembly areas, should remain as § 36.308 in the final rule with additional language. This paragraph is designed to ensure that individuals with disabilities have an opportunity to access specialty seating areas that entitle spectators to distinct services or amenities not generally available to others. This provision is not, as several commenters mistakenly thought, designed to cover luxury boxes and suites. Those areas have separate requirements outlined in section 221 of the 2010 Standards.

Section 36.308 requires only that accessible seating be provided in each area with distinct services or amenities. To the extent a covered entity provides multiple seating areas with the same services and amenities, each of those areas would not be distinct and thus all of them would not be required to be accessible. For example, if a facility has similar dining service in two areas, both areas would not need to be made accessible; however, if one dining service area is open to families, while the other is open only to individuals over the age of 21, both areas would need to be made accessible. Factors distinguishing specialty seating areas generally are dictated by the type of facility or event, but may include, for example, such distinct services and amenities as access to wait staff for in-seat food or beverage service; availability of catered food or beverages for pre-game, intermission, or post-game events; restricted access to lounges with special amenities, such as couches or flat-screen televisions; or access to team personnel or facilities for team-sponsored events (e.g., autograph sessions, sideline passes, or facility tours) not otherwise available to other spectators.

The NPRM required public accommodations to locate wheelchair seating spaces and companion seats in each specialty seating area within the assembly area. The Department has added language in the final rule stating that public accommodations that cannot place wheelchair seating spaces and companion seats in each specialty area because it is not readily achievable to do so may meet their obligation by providing specialty services or amenities to individuals with disabilities and their companions at other designated accessible locations at no additional cost. For example, if a theater that only has barrier removal obligations provides wait service to spectators in the mezzanine, and it is not readily achievable to place accessible seating there, it may meet its obligation by providing wait service to patrons with disabilities who use wheelchairs and their companions at other designated accessible locations at no additional cost. This provision does not obviate the obligation to comply with applicable requirements for new construction and alterations, including dispersion of accessible seating.

Section 36.309 Examinations and Courses

Section 36.309(a) sets forth the general rule that any private entity that offers examinations or courses relating to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. In the NPRM preamble and proposed regulatory amendment and in this final rule, the Department relied on its history of enforcement efforts, research, and body of knowledge of testing and modifications, accommodations, and aids in detailing steps testing entities should take to ensure that persons with disabilities receive appropriate modifications, accommodations, or auxiliary aids in examination and course settings as required by the ADA. The Department received comments from disability rights groups, organizations that administer tests, State governments, professional associations, and individuals on the language appearing in the NPRM preamble and amended regulation and has carefully considered these comments.

The Department initially set out the parameters of appropriate documentation requests relating to examinations and courses covered by this section in the 1991 preamble at 28 CFR part 36, stating that "requests for documentation must be reasonable and

Add-49

must be limited to the need for the modification or aid requested." See 28 CFR part 36, app. B at 735 (2009). Since that time, the Department, through its enforcement efforts pursuant to section 309, has addressed concerns that requests by testing entities for documentation regarding the existence of an individual's disability and need for a modification or auxiliary aid or service were often inappropriate and burdensome. The Department proposed language stating that while it may be appropriate for a testing entity to request that an applicant provide documentation supporting the existence of a disability and the need for a modification, accommodation, or auxiliary aid or service, the request by the testing entity for such documentation must be reasonable and limited. The NPRM proposed that testing entities should narrowly tailor requests for documentation, limiting those requests to materials that will allow the testing entities to ascertain the nature of the disability and the individual's need for the requested modification, accommodation, or auxiliary aid or service. This proposal codified the 1991 rule's preamble language regarding testing entities' requests for information supporting applicants' requests for testing modifications or accommodations.

Overall, most commenters supported this addition to the regulation. These commenters generally agreed that documentation sought by testing entities to support requests for modifications and testing accommodations should be reasonable and tailored. Commenters noted, for example, that the proposal to require reasonable and tailored documentation requests "is not objectionable. Indeed, it largely tracks DOJ's long-standing informal guidance that 'requests for documentation must be reasonable and limited to the need for the modification or aid requested.' "

Commenters including disability rights groups, State governments, professional associations, and individuals made it clear that, in addition to the proposed regulatory change, other significant problems remain for individuals with disabilities who seek necessary modifications to examinations and courses. These problems include detailed questions about the nature of documentation materials submitted by candidates, testing entities' questioning of documentation provided by qualified professionals with expertise in the particular disability at issue, and lack of timeliness in determining whether to provide requested accommodations or modifications. Several commenters expressed enthusiasm for the preamble language addressing some of these issues, and some of these commenters recommended the incorporation of portions of this preamble language into the regulatory text. Some testing entities expressed concerns and uncertainty about the language in the preamble and sought clarifications about its meaning. These commenters focused most of their attention on the following language from the NPRM preamble:

Generally, a testing entity should accept without further inquiry documentation provided by a qualified professional who has made an individualized assessment of the applicant. Appropriate documentation may include a letter from a qualified professional or evidence of a prior diagnosis, or accommodation, or classification, such as eligibility for a special education program. When an applicant's documentation is recent and demonstrates a consistent history of a diagnosis, there is no need for further inquiry into the nature of the disability. A testing entity should consider an applicant's past use of a particular auxiliary aid or service.

73 FR 34508, 34539 (June 17, 2008).

Professional organizations, State governments, individuals, and disability rights groups fully supported the Department's preamble language and recommended further modification of the regulations to encompass the issues raised in the preamble. A disability rights group recommended that the Department incorporate the preamble language into the regulations to ensure that "documentation demands are strictly limited in scope and met per se when documentation of previously provided accommodations or aids is provided." One professional education organization noted that many testing corporations disregard the documented diagnoses of qualified professionals, and instead substitute their own, often unqualified diagnoses of individuals with disabilities. Commenters confirmed that testing entities sometimes ask for unreasonable information that is either impossible, or extremely onerous, to provide. A disability rights organization supported the Department's proposals and noted that private testing companies impose burdensome documentation requirements upon applicants with disabilities seeking accommodations and that complying with the documentation requests is frequently so difficult, and negotiations over the

<div align="center">Add-50</div>

requests so prolonged, that test applicants ultimately forgo taking the test. Another disability rights group urged the Department to "expand the final regulatory language to ensure that regulations accurately provide guidance and support the comments made about reducing the burden of documenting the diagnosis and existence of a disability."

Testing entities, although generally supportive of the proposed regulatory amendment, expressed concern regarding the Department's proposed preamble language. The testing entities provided the Department with lengthy comments in which they suggested that the Department's rationale delineated in the preamble potentially could limit them from gathering meaningful and necessary documentation to determine whether, in any given circumstance, a disability is presented, whether modifications are warranted, and which modifications would be most appropriate. Some testing entities raised concerns about individuals skewing testing results by falsely claiming or feigning disabilities as an improper means of seeking advantage on an examination. Several testing entities raised concerns about and sought clarification regarding the Department's use of certain terms and concepts in the preamble, including "without further inquiry," "appropriate documentation," "qualified professional," "individualized assessment," and "consider." These entities discussed the preamble language at length, noting that testing entities need to be able to question some aspects of testing applicants' documentation or to request further documentation from some candidates when the initial documentation is unclear or incomplete. One testing entity expressed concern that the Department's preamble language would require the acceptance of a brief note on a doctor's prescription pad as adequate documentation of a disability and the need for an accommodation. One medical examination organization stated that the Department's preamble language would result in persons without disabilities receiving accommodations and passing examinations as part of a broad expansion of unwarranted accommodations, potentially endangering the health and welfare of the general public. Another medical board "strenuously objected" to the "without further inquiry" language. Several of the testing entities expressed concern that the Department's preamble language might require testing companies to accept documentation from persons with temporary or questionable disabilities, making test scores less reliable, harming persons with legitimate entitlements, and resulting in additional expense for testing companies to accommodate more test takers.

It remains the Department's view that, when testing entities receive documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation.

Several commenters sought clarifications on what types of documentation are acceptable to demonstrate the existence of a disability and the need for a requested modification, accommodation, or aid. The Department believes that appropriate documentation may vary depending on the nature of the disability and the specific modification or aid requested, and accordingly, testing entities should consider a variety of types of information submitted. Examples of types of information to consider include recommendations of qualified professionals familiar with the individual, results of psycho-educational or other professional evaluations, an applicant's history of diagnosis, participation in a special education program, observations by educators, or the applicant's past use of testing accommodations. If an applicant has been granted accommodations post-high school by a standardized testing agency, there is no need for reassessment for a subsequent examination.

Some commenters expressed concern regarding the use of the term "letter" in the proposed preamble sentence regarding appropriate documentation. The NPRM preamble language stated that "[a]ppropriate documentation may include a letter from a qualified professional or evidence of a prior diagnosis, accommodation, or classification, such as eligibility for a special education program." 73 FR 34508, 34539 (June 17, 2008). Some testing entities posited that the preamble language would require them to accept a brief letter from a doctor or even a doctor's note on a prescription pad indicating "I've been treating (student) for ADHD and he/she is entitled to extend time on the ACT." The Department's reference in the NPRM preamble to letters from physicians or other professionals was provided in order to offer examples of some types of acceptable documentation that may be considered by testing entities in evaluating the existence of an applicant's disability and the need for a certain modification, accommodation, or aid. No one piece of evidence may be dispositive in make a testing accommodation determination. The significance of a letter or other communication from a doctor or other qualified professional would depend on

the professional's relationship with the candidate and the specific content of the communication, as well as how the letter fits in with the totality of the other factors used to determine testing accommodations under this rule. Similarly, an applicant's failure to provide results from a specific test or evaluation instrument should not of itself preclude approval of requests for modifications, accommodations, or aids if the documentation provided by the applicant, in its entirety, is sufficient to demonstrate that the individual has a disability and requires a requested modification, accommodation, or aid on the relevant examination. This issue is discussed in more detail below.

One disability rights organization noted that requiring a 25–year old who was diagnosed in junior high school with a learning disability and accommodated ever since "to produce elementary school report cards to demonstrate symptomology before the age of seven is unduly burdensome." The same organization commented that requiring an individual with a long and early history of disability to be assessed within three years of taking the test in question is similarly burdensome, stating that "[t]here is no scientific evidence that learning disabilities abate with time, nor that Attention Deficits abate with time * * *." This organization noted that there is no justification for repeatedly subjecting people to expensive testing regimens simply to satisfy a disbelieving industry. This is particularly true for adults with, for example, learning disabilities such as dyslexia, a persistent condition without the need for retesting once the diagnosis has been established and accepted by a standardized testing agency.

Some commenters from testing entities sought clarification regarding who may be considered a "qualified professional." Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought. For example, a podiatrist would not be considered to be a qualified professional to diagnose a learning disability or support a request for testing accommodations on that basis. Types of professionals who might possess the appropriate credentials and expertise are doctors (including psychiatrists), psychologists, nurses, physical therapists, occupational therapists, speech therapists, vocational rehabilitation specialists, school counselors, and licensed mental health professionals. Additionally, while testing applicants should present documentation from qualified professionals with expertise in the pertinent field, it also is critical that testing entities that review documentation submitted by prospective examinees in support of requests for testing modifications or accommodations ensure that their own reviews are conducted by qualified professionals with similarly relevant expertise.

Commenters also sought clarification of the term individualized assessment. The Department's intention in using this term is to ensure that documentation provided on behalf of a testing candidate is not only provided by a qualified professional, but also reflects that the qualified professional has individually and personally evaluated the candidate as opposed to simply considering scores from a review of documents. This is particularly important in the learning disabilities context, where proper diagnosis requires face-to-face evaluation. Reports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment.

Some testing entities objected to the NPRM preamble's use of the phrase "without further inquiry." The Department's intention here is to address the extent to which testing entities should accept documentation provided by an applicant when the testing entity is determining the need for modifications, accommodations, or auxiliary aids or services. The Department's view is that applicants who submit appropriate documentation, e.g., documentation that is based on the careful individual consideration of the candidate by a professional with expertise relating to the disability in question, should not be subjected to unreasonably burdensome requests for additional documentation. While some testing commenters objected to this standard, it reflects the Department's longstanding position. When an applicant's documentation demonstrates a consistent history of a diagnosis of a disability, and is prepared by a qualified professional who has made an individualized evaluation of the applicant, there is little need for further inquiry into the nature of the disability and generally testing entities should grant the requested modification, accommodation, or aid.

After a careful review of the comments, the Department has decided to maintain the proposed regulatory language on the scope of appropriate documentation in § 36.309(b)(1)(iv). The Department has also added new regulatory language at § 36.309(b)(1)(v) that provides that testing entities shall give considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act (IDEA) or a plan providing services pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan). These additions to the regulation are necessary because the Department's position on the bounds of appropriate documentation contained in Appendix B, 28 CFR part 36, app. B (2009), has not been implemented consistently and fully by organizations that administer tests.

The new regulatory language clarifies that an applicant's past use of a particular modification, accommodation, or auxiliary aid or service in a similar testing setting or pursuant to an IEP or Section 504 Plan provides critical information in determining those examination modifications that would be applicable in a given circumstance. The addition of this language and the appropriate weight to be accorded is seen as important by the Department because the types of accommodations provided in both these circumstances are typically granted in the context of individual consideration of a student's needs by a team of qualified and experienced professionals. Even though these accommodations decisions form a common sense and logical basis for testing entities to rely upon, they are often discounted and ignored by testing entities.

For example, considerable weight is warranted when a student with a Section 504 Plan in place since middle school that includes the accommodations of extra time and a quiet room for testing is seeking these same accommodations from a testing entity covered by section 309 of the Act. In this example, a testing entity receiving such documentation should clearly grant the request for accommodations. A history of test accommodations in secondary schools or in post-secondary institutions, particularly when determined through the rigors of a process required and detailed by Federal law, is as useful and instructive for determining whether a specific accommodation is required as accommodations provided in standardized testing situations.

It is important to note, however, that the inclusion of this weight does not suggest that individuals without IEPs or Section 504 Plans are not also entitled to receive testing accommodations. Indeed, it is recommended that testing entities must consider the entirety of an applicant's history to determine whether that history, even without the context of a IEP or Section 504 Plan, indicates a need for accommodations. In addition, many students with learning disabilities have made use of informal, but effective accommodations. For example, such students often receive undocumented accommodations such as time to complete tests after school or at lunchtime, or being graded on content and not form or spelling of written work. Finally, testing entities shall also consider that because private schools are not subject to the IDEA, students at private schools may have a history of receiving accommodations in similar settings that are not pursuant to an IEP or Section 504 Plan.

Some testing entities sought clarification that they should only be required to consider particular use of past modifications, accommodations, auxiliary aids or services received by testing candidates for prior testing and examination settings. These commenters noted that it would be unhelpful to consider the classroom accommodations for a testing candidate, as those accommodations would not typically apply in a standardized test setting. The Department's history of enforcement in this area has demonstrated that a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations.

The Department also incorporates the NPRM preamble's "timely manner" concept into the new regulatory language at § 36.309(b)(1)(vi). Under this provision, testing entities are required to respond in a timely manner to requests for testing accommodations in order to ensure equal opportunity for persons with disabilities. Testing entities are to ensure that their established process for securing testing accommodations provides applicants with a reasonable opportunity to supplement the testing entities' requests for additional information, if necessary, and still be able to take the test in the same testing cycle. A disability rights organization commented that testing entities should not subject applicants to unreasonable and intrusive requests

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 77

for information in a process that should provide persons with disabilities effective modifications in a timely manner, fulfilling the core objective of title III to provide equal access. Echoing this perspective, several disability rights organizations and a State government commenter urged that testing entities should not make unreasonably burdensome demands for documentation, particularly where those demands create impediments to receiving accommodations in a timely manner. Access to examinations should be offered to persons with disabilities in as timely a manner as it is offered to persons without disabilities. Failure by a testing entity to act in a timely manner, coupled with seeking unnecessary documentation, could result in such an extended delay that it constitutes a denial of equal opportunity or equal treatment in an examination setting for persons with disabilities.

Section 36.311 Mobility Devices

Section 36.311 of the NPRM clarified the scope and circumstances under which covered entities are legally obligated to accommodate various "mobility devices." Section 36.311 set forth specific requirements for the accommodation of mobility devices, including wheelchairs, manually-powered mobility aids, and other power-driven mobility devices.

In both the NPRM and the final rule, § 36.311(a) states the general rule that in any areas open to pedestrians, public accommodations shall permit individuals with mobility disabilities to use wheelchairs and manually-powered mobility aids, including walkers, crutches, canes, braces, or similar devices. Because mobility scooters satisfy the definition of "wheelchair" (i.e., "a manually-operated or power-driven device designed primarily for use by an individual with a mobility disability for the main purpose of indoor, or of both indoor and outdoor locomotion"), the reference to them in § 36.311(a) of the final rule has been omitted to avoid redundancy.

Most business commenters expressed concern that permitting the use of other power-driven mobility devices by individuals with mobility disabilities would make such devices akin to wheelchairs and would require them to make physical changes to their facilities to accommodate their use. This concern is misplaced. If a facility complies with the applicable design requirements in the 1991 Standards or the 2010 Standards, the public accommodation will not be required to exceed those standards to accommodate the use of wheelchairs or other power-driven mobility devices that exceed those requirements.

Legal standard for other power-driven mobility devices. The NPRM version of § 36.311(b) provided that a public accommodation "shall make reasonable modifications in its policies, practices, and procedures to permit the use of other power-driven mobility devices by individuals with disabilities, unless the public accommodation can demonstrate that the use of the device is not reasonable or that its use will result in a fundamental alteration in the nature of the public accommodation's goods, services, facilities, privileges, advantages, or accommodations." 73 FR 34508, 34556 (June 17, 2008). In other words, public accommodations are by default required to permit the use of other power-driven mobility devices; the burden is on them to prove the existence of a valid exception.

Most commenters supported the notion of assessing whether the use of a particular device is reasonable in the context of a particular venue. Commenters, however, disagreed about the meaning of the word "reasonable" as it is used in § 36.311(b) of the NPRM. Virtually every business and industry commenter took the use of the word "reasonable" to mean that a general reasonableness standard would be applied in making such an assessment. Advocacy and nonprofit groups almost universally objected to the use of a general reasonableness standard with regard to the assessment of whether a particular device should be allowed at a particular venue. They argued that the assessment should be based on whether reasonable modifications could be made to allow a particular device at a particular venue, and that the only factors that should be part of the calculus that results in the exclusion of a particular device are undue burden, direct threat, and fundamental alteration.

A few commenters opposed the proposed provision requiring public accommodations to assess whether reasonable modifications can be made to allow other power-driven mobility devices, preferring instead that the Department issue guidance materials so that public accommodations would not have to incur the cost of such analyses. Another commenter noted a

Add-54

**PAGES OMITTED**

---

Code of Federal Regulations
  Title 29. Labor
    Subtitle B. Regulations Relating to Labor
      Chapter XIV. Equal Employment Opportunity Commission
        Part 1630. Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act (Refs & Annos)

29 C.F.R. § 1630.2

§ 1630.2 Definitions.

Effective: April 4, 2012

Currentness

&lt;Notes of Decisions for 29 CFR § 1630.2 are displayed in separate documents. Notes of Decisions for subdivision I are contained in this document. For Notes of Decisions for subdivisions II to end, see documents for 29 CFR § 1630.2, post.&gt;

(a) Commission means the Equal Employment Opportunity Commission established by section 705 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–4).

(b) Covered Entity means an employer, employment agency, labor organization, or joint labor management committee.

(c) Person, labor organization, employment agency, commerce and industry affecting commerce shall have the same meaning given those terms in section 701 of the Civil Rights Act of 1964 (42 U.S.C. 2000e).

(d) State means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.

(e) Employer—

(1) In general. The term employer means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, from July 26, 1992 through July 25, 1994, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year and any agent of such person.

(2) Exceptions. The term employer does not include—

(i) The United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

Add-56

(ii) A bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of the Internal Revenue Code of 1986.

(f) Employee means an individual employed by an employer.

(g) Definition of "disability"—

(1) In general. Disability means, with respect to an individual—

(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(ii) A record of such an impairment; or

(iii) Being regarded as having such an impairment as described in paragraph (l) of this section. This means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both "transitory and minor."

(2) An individual may establish coverage under any one or more of these three prongs of the definition of disability, i.e., paragraphs (g)(1)(i) (the "actual disability" prong), (g)(1)(ii) (the "record of" prong), and/or (g)(1)(iii) (the "regarded as" prong) of this section.

(3) Where an individual is not challenging a covered entity's failure to make reasonable accommodations and does not require a reasonable accommodation, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of disability, which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" and/or "record of" prong regardless of whether the individual is challenging a covered entity's failure to make reasonable accommodations or requires a reasonable accommodation.

Note to paragraph (g): See § 1630.3 for exceptions to this definition.

(h) Physical or mental impairment means—

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(i) Major life activities—

(1) In general. Major life activities include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) In determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. ADAAA section 2(b)(4) (Findings and Purposes). Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life."

(j) Substantially limits—

(1) Rules of construction. The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

Add-58

(iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

(v) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii) An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

(ix) The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

(2) Non-applicability to the "regarded as" prong. Whether an individual's impairment "substantially limits" a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the "regarded as" prong) of this section.

(3) Predictable assessments—

(i) The principles set forth in paragraphs (j)(1)(i) through (ix) of this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA as amended.

(ii) Applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

Add-59

(iii) For example, applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: Deafness substantially limits hearing; blindness substantially limits seeing; an intellectual disability (formerly termed mental retardation) substantially limits brain function; partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function; autism substantially limits brain function; cancer substantially limits normal cell growth; cerebral palsy substantially limits brain function; diabetes substantially limits endocrine function; epilepsy substantially limits neurological function; Human Immunodeficiency Virus (HIV) infection substantially limits immune function; multiple sclerosis substantially limits neurological function; muscular dystrophy substantially limits neurological function; and major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function. The types of impairments described in this section may substantially limit additional major life activities not explicitly listed above.

(4) Condition, manner, or duration—

(i) At all times taking into account the principles in paragraphs (j)(1)(i) through (ix) of this section, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(ii) Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

(iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.

(iv) Given the rules of construction set forth in paragraphs (j)(1)(i) through (ix) of this section, it may often be unnecessary to conduct an analysis involving most or all of these types of facts. This is particularly true with respect to impairments such as those described in paragraph (j)(3)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

(5) Examples of mitigating measures—Mitigating measures include, but are not limited to:

Add-60

(i) Medication, medical supplies, equipment, or appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

(ii) Use of assistive technology;

(iii) Reasonable accommodations or "auxiliary aids or services" (as defined by 42 U.S.C. 12103(1));

(iv) Learned behavioral or adaptive neurological modifications; or

(v) Psychotherapy, behavioral therapy, or physical therapy.

(6) Ordinary eyeglasses or contact lenses—defined. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

(k) Has a record of such an impairment—

(1) In general. An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(2) Broad construction. Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (j) of this section apply.

(3) Reasonable accommodation. An individual with a record of a substantially limiting impairment may be entitled, absent undue hardship, to a reasonable accommodation if needed and related to the past disability. For example, an employee with an impairment that previously limited, but no longer substantially limits, a major life activity may need leave or a schedule change to permit him or her to attend follow-up or "monitoring" appointments with a health care provider.

(l) "Is regarded as having such an impairment." The following principles apply under the "regarded as" prong of the definition of disability (paragraph (g)(1)(iii) of this section) above:

(1) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that

<div align="center">Add-61</div>

impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment

(2) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability within the meaning of section 102 of the ADA, 42 U.S.C. 12112.

(m) The term "qualified," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. See § 1630.3 for exceptions to this definition.

(n) Essential functions—

(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

<div align="center">Add-62</div>

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

(o) Reasonable accommodation.

(1) The term reasonable accommodation means:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

(2) Reasonable accommodation may include but is not limited to:

(i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

(3) To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

Add-63

(4) A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the "actual disability" prong (paragraph (g)(1)(i) of this section), or "record of" prong (paragraph (g)(1)(ii) of this section), but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (paragraph (g)(1)(iii) of this section).

(p) Undue hardship—

(1) In general. Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (p)(2) of this section.

(2) Factors to be considered. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include:

(i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

(q) Qualification standards means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired.

(r) Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

§ 1630.2 Definitions., 29 C.F.R. § 1630.2

on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

**Credits**
[76 FR 17000, March 25, 2011; 77 FR 20295, April 4, 2012]

SOURCE: 56 FR 35734, July 26, 1991; 76 FR 16999, March 25, 2011, unless otherwise noted.

AUTHORITY: 42 U.S.C. 12116 and 12205a of the Americans with Disabilities Act, as amended.

Notes of Decisions (2017)

Current through March 31, 2022; 87 FR 18739.

**End of Document**                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.                              10

Code of Federal Regulations
Title 45. Public Welfare
Subtitle A. Department of Health and Human Services (Refs & Annos)
Subchapter A. General Administration (Refs & Annos)
Part 84. Nondiscrimination on the Basis of Handicap in Programs or Activities Receiving Federal Financial Assistance (Refs & Annos)
Subpart A. General Provisions

45 C.F.R. § 84.3

§ 84.3 Definitions.

Effective: June 8, 2005
Currentness

As used in this part, the term:

(a) The Act means the Rehabilitation Act of 1973, Pub.L. 93–112, as amended by the Rehabilitation Act Amendments of 1974, Pub.L. 93–516, 29 U.S.C. 794.

(b) Section 504 means section 504 of the Act.

(c) Education of the Handicapped Act means that statute as amended by the Education for all Handicapped Children Act of 1975, Pub.L. 94–142, 20 U.S.C. 1401 et seq.

(d) Department means the Department of Health and Human Services.

(e) Director means the Director of the Office for Civil Rights of the Department.

(f) Recipient means any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

(g) Applicant for assistance means one who submits an application, request, or plan required to be approved by a Department official or by a recipient as a condition to becoming a recipient.

(h) Federal financial assistance means any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Department provides or otherwise makes available assistance in the form of:

Add-66

(1) Funds;

(2) Services of Federal personnel; or

(3) Real and personal property or any interest in or use of such property, including:

(i) Transfers or leases of such property for less than fair market value or for reduced consideration; and

(ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government.

(i) Facility means all or any portion of buildings, structures, equipment, roads, walks, parking lots, or other real or personal property or interest in such property.

(j) Handicapped person.

(1) Handicapped persons means any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

(2) As used in paragraph (j)(1) of this section, the phrase:

(i) Physical or mental impairment means (A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(ii) Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(iii) Has a record of such an impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(iv) Is regarded as having an impairment means (A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment;

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

or (C) has none of the impairments defined in paragraph (j)(2)(i) of this section but is treated by a recipient as having such an impairment.

(k) Program or activity means all of the operations of—

(1)(i) A department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(ii) The entity of such State or local government that distributes Federal financial assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(i) A college, university, or other postsecondary institution, or a public system of higher education; or

(ii) A local educational agency (as defined in 20 U.S.C. 7801), system of vocational education, or other school system;

(3)(i) An entire corporation, partnership, or other private organization, or an entire sole proprietorship—

(A) If assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(B) Which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(ii) The entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) Any other entity which is established by two or more of the entities described in paragraph (k)(1), (2), or (3) of this section; any part of which is extended Federal financial assistance.

(l) Qualified handicapped person means:

(1) With respect to employment, a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question;

(2) With respect to public preschool elementary, secondary, or adult educational services, a handicapped person (i) of an age during which nonhandicapped persons are provided such services, (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under section 612 of the Education of the Handicapped Act; and

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

§ 84.3 Definitions., 45 C.F.R. § 84.3

(3) With respect to postsecondary and vocational education services, a handicapped person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity;

(4) With respect to other services, a handicapped person who meets the essential eligibility requirements for the receipt of such services.

(m) Handicap means any condition or characteristic that renders a person a handicapped person as defined in paragraph (j) of this section.

(Authority: 29 U.S.C. 794(b))

**Credits**

[70 FR 24319, May 9, 2005]

SOURCE: 42 FR 22677, May 4, 1977; 55 FR 52142, Dec. 19, 1990; 62 FR 16955, 17005, April 8, 1997; 62 FR 31669, June 10, 1997; 70 FR 24319, May 9, 2005, unless otherwise noted.

AUTHORITY: 20 U.S.C. 1405; 29 U.S.C. 794; 42 U.S.C. 290dd–2; 21 U.S.C. 1174.

Notes of Decisions (243)

Current through March 31, 2022; 87 FR 18739.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                    4